Case: 1:20-cv-04468 Document #: 1-1 Filed: 07/30/20 Page 1 of 41 PageID #:5

| 2120 - Served | 2220 - Not Served | 2620 - Sec. of State | | |
|---|---|---|---|---|
| 2121 - Alias Served | 2221 - Alias Not Served | 2621 - Alias Sec. of State | Cook County, IL | (2-09-10) CCM N081 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### MUNICIPAL DEPARTMENT, 1st_____ DISTRICT  9655969

FILED
7/2/2020 2:08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

Morgan Street Partners LLC,

**Plaintiff(s)**

v.

Chicago Climbing Gym Company LLC and Jeremy Balboni,

**Defendant(s)**

Case No. 2020 M1 20201705220

Hearing Date: 8/18/2020 9:30 AM - 9:30 AM

Rent Amount Claimed: $ $229,102.55 Plus Possession

* Trial Date: Return Date: 8/18/2020 Time: 9:30 a.m.

Court Location: Richard J. Daley Center

Please serve as follows: ☐ Certified Mail ☐ Sheriff Service ☐ Alias (Plaintiff check one)
Courtroom Number: 1404

## SUMMONS FOR TRIAL
### BEFORE YOU GO TO COURT, YOU MUST PAY YOUR APPEARANCE FEE.

**You are hereby SUMMONED to Court, however, you must file your appearance and pay the required fee with the Clerk of the Circuit Court's Office at the court location on this form, on or before the date and before the time of the trial. IF YOU DO NOT FILE AN APPEARANCE** and contest the claim, a JUDGMENT BY DEFAULT may be entered for the relief requested in the complaint, ordering that you be evicted. If judgment is entered against you, the SHERIFF may evict you. A money judgment may also be entered against you if requested in the complaint.

The Plaintiff(s), named above, has/have filed a complaint in this Court to have you evicted. A true and correct copy of the complaint is attached.

**THEREFORE, you, the Defendant(s), after you have filed an appearance, are hereby summoned to appear in person before**

this Court on* ___Return Date: 8/18/2020___, 2020 at __9:30 a.m.__ (a.m.)(p.m.) in Courtroom _____

at __Richard J. Daley Center, 50 W. Washington Street, Chicago, IL 60602__, at which time and place a
(Court location)

**TRIAL will be held on the complaint.** (See top of this form if blanks not filled in).

*Not less than 7 days nor more than 40 days after issuance of summons.

### INSTRUCTIONS TO SHERIFF

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than seven (7) days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

Atty. No.: __42258__

Name: __Sanchez Daniels & Hoffman LLP__

Atty. for: __Plaintiff__

Address: __333 West Wacker Drive, Suite 500__

City/State/Zip: __Chicago, Illinois 60606__

Telephone: __(312) 641-1555__

WITNESS _____, _____

7/2/2020 2:08 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

DATE OF SERVICE _____, _____
(To be inserted by officer on copy left with Defendant or other person)

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

This form replaces CCMD-81, & 81A, CCMI-81 & 81A

(OVER)

ORIGINAL - COURT FILE

**EXHIBIT A**

| 2120 - Served | 2220 - Not Served | 2620 - Sec. of State | |
|---|---|---|---|
| 2121 - Alias Served | 2221 - Alias Not Served | 2621 - Alias Sec. of State | (2/09/10) CCM N081 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, 1st DISTRICT

Morgan Street Partners LLC,

Plaintiff(s)

v.

Chicago Climbing Gym Company LLC and Jeremy Balboni,

Defendant(s)

Case No. 2011 M1

Rent Amount Claimed: $ $229,102.55 Plus Possession

* Trial Date: _____ Time: 9:30 a.m.

Court Location: Richard J. Daley Center

Please serve as follows: ☐ Certified Mail ☐ Sheriff Service ☐ Alias (Plaintiff check one)

### SUMMONS FOR TRIAL
**BEFORE YOU GO TO COURT, YOU MUST PAY YOUR APPEARANCE FEE.**

You are hereby SUMMONED to Court, however, you must file your appearance and pay the required fee with the Clerk of the Circuit Court's Office at the court location on this form, on or before the date and before the time of the trial. IF YOU DO NOT FILE AN APPEARANCE and contest the claim, a JUDGMENT BY DEFAULT may be entered for the relief requested in the complaint, ordering that you be evicted. If judgment is entered against you, the SHERIFF may evict you. A money judgment may also be entered against you if requested in the complaint.

The Plaintiff(s), named above, has/have filed a complaint in this Court to have you evicted. A true and correct copy of the complaint is attached.

THEREFORE, you, the Defendant(s), after you have filed an appearance, are hereby summoned to appear in person before

this Court on* _____, 2020 at 9:30 a.m. (a.m.)(p.m.) in Courtroom _____

at Richard J. Daley Center, 50 W. Washington Street, Chicago, IL 60602, at which time and place a
(Court location)

TRIAL will be held on the complaint. (See top of this form if blanks not filled in.)

*Not less than 7 days nor more than 40 days after issuance of summons.

### INSTRUCTIONS TO SHERIFF

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than seven (7) days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

Atty. No.: 42258

Name: Sanchez Daniels & Hoffman LLP

Atty. for: Plaintiff

Address: 333 West Wacker Drive, Suite 500

City/State/Zip: Chicago, Illinois 60606

Telephone: (312) 641-1555

WITNESS _____, _____

**DOROTHY BROWN, Clerk of Court**

DATE OF SERVICE _____, _____
(To be inserted by officer on copy left with Defendant or other person)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

This form replaces CCMD-81, & 81A, CCMI-81 & 81A

(OVER)

| 2120 – Served | 2220 – Not Served | 2620 – Sec. of State | |
|---|---|---|---|
| 2121 – Alias Served | 2221 – Alias Not Served | 2621 – Alias Sec. of State | (2-09-10) CCM N081 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, 1st            DISTRICT

Morgan Street Partners LLC,

_____
Plaintiff(s)

v.

Chicago Climbing Gym Company LLC and Jeremy Balboni,

_____
Defendant(s)

Case No. 2020 M1 _____

Rent Amount Claimed: $ $229,102.55 Plus Possession

* Trial Date: _____ Time: 9:30 a.m.

Court Location: Richard J. Daley Center

Please serve as follows: ☐ Certified Mail ☐ Sheriff Service ☐ Alias (Plaintiff check one)

### SUMMONS FOR TRIAL
### BEFORE YOU GO TO COURT, YOU MUST PAY YOUR APPEARANCE FEE.

**You are hereby SUMMONED to Court, however, you must file your appearance and pay the required fee with the Clerk of the Circuit Court's Office at the court location on this form, on or before the date and before the time of the trial. IF YOU DO NOT FILE AN APPEARANCE and contest the claim, a JUDGMENT BY DEFAULT may be entered for the relief requested in the complaint, ordering that you be evicted. If judgment is entered against you, the SHERIFF may evict you. A money judgment may also be entered against you if requested in the complaint.**

The Plaintiff(s), named above, has/have filed a complaint in this Court to have you evicted. A true and correct copy of the complaint is attached.

**THEREFORE,** you, the Defendant(s), after you have filed an appearance, are hereby summoned to appear in person before

this Court on* _____, 2020 at 9:30 a.m. (a.m.)(p.m.) in Courtroom _____

at _Richard J. Daley Center, 50 W. Washington Street, Chicago, IL 60602_, at which time and place a
                                                (Court location)

**TRIAL** will be held on the complaint. (See top of this form if blanks not filled in).

*Not less than 7 days nor more than 40 days after issuance of summons.

### INSTRUCTIONS TO SHERIFF

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than seven (7) days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

Atty. No.: 42258

Name: Sanchez Daniels & Hoffman LLP

Atty. for: Plaintiff

Address: 333 West Wacker Drive, Suite 500

City State Zip: Chicago, Illinois 60606

Telephone: (312) 641-1555

WITNESS _____, _____

_____
**DOROTHY BROWN, Clerk of Court**

DATE OF SERVICE _____, _____
(To be inserted by officer on copy left with Defendant or other person)

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

This form replaces CCMD-N81 & N8A, CCME-N81 & N8A                                    (OVER)

| 2120 - Served | 2220 - Not Served | 2620 - Sec. of State | |
|---|---|---|---|
| 2121 - Alias Served | 2221 - Alias Not Served | 2621 - Alias Sec. of State | (2/09/10) CCM N081 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## MUNICIPAL DEPARTMENT, __1st__ DISTRICT

Morgan Street Partners LLC,

**Plaintiff(s)**

v.

Chicago Climbing Gym Company LLC and Jeremy Balboni,

**Defendant(s)**

Case No. 2020 M1

Rent Amount Claimed: $ $229,102.55 Plus Possession

* Trial Date: _____ Time: 9:30 a.m.

Court Location: Richard J. Daley Center

Please serve as follows: ☐ Certified Mail ☐ Sheriff Service ☐ Alias (Plaintiff check one)

## SUMMONS FOR TRIAL
### BEFORE YOU GO TO COURT, YOU MUST PAY YOUR APPEARANCE FEE.

**You are hereby SUMMONED to Court, however, you must file your appearance and pay the required fee with the Clerk of the Circuit Court's Office at the court location on this form, on or before the date and before the time of the trial. IF YOU DO NOT FILE AN APPEARANCE and contest the claim, a JUDGMENT BY DEFAULT may be entered for the relief requested in the complaint, ordering that you be evicted. If judgment is entered against you, the SHERIFF may evict you. A money judgment may also be entered against you if requested in the complaint.**

The Plaintiff(s), named above, has/have filed a complaint in this Court to have you evicted. A true and correct copy of the complaint is attached.

**THEREFORE, you, the Defendant(s), after you have filed an appearance, are hereby summoned to appear in person before**

this Court on* _____, 2020 at 9:30 a.m. (a.m.)(p.m.) in Courtroom _____

at Richard J. Daley Center, 50 W. Washington Street, Chicago, IL 60602 , at which time and place a
(Court location)

**TRIAL will be held on the complaint.** (See top of this form if blanks not filled in.)

*Not less than 7 days nor more than 40 days after issuance of summons.

### INSTRUCTIONS TO SHERIFF

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service and not less than seven (7) days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

Atty. No.: 42258

Name: Sanchez Daniels & Hoffman LLP

Atty. for: Plaintiff

Address: 333 West Wacker Drive, Suite 500

City/State/Zip: Chicago, Illinois 60606

Telephone: (312) 641-1555

WITNESS _____, _____

_____
**DOROTHY BROWN, Clerk of Court**

DATE OF SERVICE _____, _____
(To be inserted by officer on copy left with Defendant or other person)

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

This form replaces CCMD-81, & 81A, CCMT-81 & 81A

(OVER)

This form replaces CCMD-81. & 81A. CCMI-81 & 81A

(2 09 10) CCM N081

## IMPORTANT INFORMATION FOR DEFENDANTS
### THIS IS AN EVICTION SUMMONS

On the date and at the time shown on the other side, the court will decide whether you will have to move or whether you can continue to stay. **YOU MUST BE ON TIME FOR COURT. HAVING TO GO TO WORK, BEING ILL, OR DOING SOMETHING ELSE DOES NOT MEAN YOU CAN MISS COURT.**

Any person wishing to sue or defend a case as an indigent must petition the court to have the fees, costs, and charges associated with the proceedings waived.

Customers may visit www.cookcountyclerkofcourt.org to access the Clerk's filing fees or telephone the Civil Division at (312) 603-5116 with additional questions.

### IF YOU DON'T COME TO COURT

The court may order you to move within a short period of time. **IF YOU DON'T MOVE,** your landlord can have the **SHERIFF** move you and all of your belongings out. The sheriff will put your property outside and you will have to make arrangements to move it somewhere else.

### YOU HAVE RIGHTS

1. You have the right to come to court and tell your side of the case.

2. You have a right to a trial by jury. A request for a jury trial must be in writing and filed with the Clerk of the Circuit Court prior to your hearing. You must request the jury trial immediately when your case is called, before your trial actually starts.

3. You may come to court and speak for yourself, or you may have a lawyer represent you. If you want a lawyer, you must get one right away. If you are unable to come to court for any reason, you should talk to a lawyer.

4. If you do not have a lawyer, and are not able to afford one, you may call one of the following Lawyer Referral Services and ask them to recommend a lawyer for you:

   - CARPLS (Cook County's Legal Aid Hotline), Telephone (312) 738-9200
   - Chicago Bar Association Lawyer Referral Service, 321 S. Plymouth Ct., Chicago, IL 60604, Telephone (312) 554-2001
   - Illinois Tenants Union Eviction Hotline, Telephone (773) 478-1133
   - Cook County Bar Association Lawyer Referral Service, 188 W. Randolph St., Suite 720, Chicago, IL 60601, Telephone (312) 630-1157
   - Other Lawyer Referral Services are listed in your telephone directory.

5. If you cannot afford a lawyer, you may call one of the following agencies that **may** be able to provide you with free legal help:

   - Cabrini-Green Legal Aid: 740 N. Milwaukee Ave., Chicago, IL 60642, Telephone (312) 738-2452(CGLA)   (Initial S20 Fee)
   - Chicago Volunteer Legal Services, Telephone (312) 332-1624
   - Legal Assistance Foundation of Metropolitan Chicago; 111 W. Jackson Blvd., 3rd Floor; Chicago, IL 60604, Telephone (312) 341-1070  Fax (312) 341-1041
   - Law Offices of Kent College of Law Advice Desk, Room 602 Daley Center, Telephone (312) 603-3579
   - Lawyer's Committee for Better Housing, Inc.; 220 S. State, Suite 1700; Chicago, IL 60604, Telephone (312) 347-7600 Fax (312) 347-7604

Participating agencies of the Housing Advocacy Consortium: Cabrini-Green Legal Aid; CARPLS; Chicago Lawyer's Committee for Civil Rights; Lawyers' Committee for Better Housing, Inc.; Legal Assistance Foundation of Metropolitan Chicago; Metropolitan Tenants Organization and National Center on Poverty Law.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Case: 1:20-cv-04468 Document #: 1-1 Filed: 07/30/20 Page 6 of 41 PageID #:10

Location: District 1 Court

Cook County, IL

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DISTRICT

FILED
7/2/2020 2 08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

| | | |
|---|---|---|
| MORGAN STREET PARTNERS LLC, | ) | 9655969 |
| | ) | |
| Plaintiff, | ) | Hearing Date: 8/18/2020 9:30 AM - 9:30 AM |
| | ) | |
| v. | ) | No. 2020 M1 20201705220 |
| | ) | |
| CHICAGO CLIMBING GYM COMPANY LLC | ) | Amount Claimed: $229,102.55 plus possession |
| and JEREMY BALBONI, | ) | Courtroom Number: 1404 |
| | ) | |
| Defendants. | ) | Return Date: Return Date: 8/18/2020 |

## VERIFIED COMPLAINT

Plaintiff, Morgan Street Partners LLC (the "Landlord"), by its attorneys, Sanchez Daniels &

Hoffman, LLP, for its Verified Complaint against Defendants, Chicago Climbing Gym Company

LLC and Jeremy Balboni, states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Landlord is the owner of commercial property located at 100 South Morgan Street,

Chicago, Cook County, Illinois 60607. (the "premises").

2. Landlord is a successor in interest to 100 S. Morgan, LLC.

3. Defendant, Chicago Climbing Gym Company LLC (the "Tenant"), is a tenant of the

premises.

4. Defendant, Jeremy Balboni (the "Guarantor") is a guarantor of the Lease Agreement

between the Landlord and Tenant.

## COUNT I – BREACH OF LEASE AGREEMENT

5. Landlord repeats, re-alleges and incorporates by reference the allegations of paragraphs

1 through 4 as and for paragraph 5 of Count I of this Complaint.

6. On or about January 15, 2013, Landlord and Tenant entered into a Space Lease

Agreement (the "Lease Agreement") for rental of the premises. (*See* Lease Agreement attached as

Exhibit 1).

7. As set forth in the Lease Agreement, Landlord agreed to provide Tenant with an Original Allowance for improvements to be performed on the premises. (*Id.*).

8. As set forth in the Lease Agreement, Tenant agreed to pay Landlord incrementally increased rent, taxes, insurance and common area maintenance. (*Id.*).

9. The rental amounts set forth in the Lease Agreement were reasonable and customary in accordance with the size and location of the premises.

10. Tenant further agreed to pay reasonable attorneys' fees and court costs in the event Landlord was forced to employ an attorney due to its breach of any term of the Lease Agreement. (*Id.*).

11. Tenant also agreed that a failure to pay rent when due, and continuance of such non-payment within 10 days, constituted a default under the Lease Agreement. (*Id.*).

12. Tenant also agreed that a failure to pay rent when due, and continuance of such non-payment, entitled Landlord to recovery of all amounts due and owing under the Lease Agreement. (*Id.*).

13. On or about January 15, 2015, Landlord and Tenant entered into a First Amendment to Space Lease Agreement (the "Lease Amendment") for rental of the premises. (*See* Lease Amendment attached as Exhibit 2).

14. As set forth in the Lease Amendment, Landlord agreed to provide Tenant with an Additional Allowance for improvements to be performed on the premises. In consideration for receipt of the Additional Allowance, Tenant agreed that, in the event of Tenant's default, the entire amount of the Original Allowance and Additional Allowance shall together with any abated rental amounts shall be immediately due and payable to Landlord. (*Id.*).

15. The Lease Amendment did not make any material change to Tenant's agreement to pay Landlord incrementally increased annual rent, taxes, insurance and common area maintenance. (*Id.*).

16. On May 11, 2020, Landlord notified the Tenant that it was in arrearage in paying the agreed upon rental amount and that an eviction action for said arrearage and possession of the premises would be commenced within 10 days (the "Notice"). (*See* Notice and receipt attached as Exhibit 3).

2

17.  Landlord also demanded that the Tenant satisfy all arrearages in rent and warned that the full amount must be tendered, in order to satisfy the arrearage and avoid an eviction action for possession and damages. (*Id.*).

18.  The Notice sent to the Tenant on May 11, 2020, was delivered to the Tenant by FedEx at the premises and received by the Tenant on May 12, 2020.

19.  Landlord complied with all of its obligations, terms and requirements set forth in the Lease Agreement and Lease Amendment.

20.  The Tenant breached the terms of the Lease Agreement and Lease Amendment by failing to pay Landlord $229,102.55 in rent, taxes, insurance and common area maintenance.

21.  Landlord has incurred damage and is entitled to recovery due to the Tenant's breach of the terms of the Lease Agreement and Lease Amendment.

22.  Moreover, the entire amount of the Original Allowance and Additional Allowance is immediately due and payable to Landlord.

23.  Furthermore, the Tenant unlawfully withhold possession of the premises from Landlord.

24.  Landlord is entitled to possession of the premises, all amounts currently due and owing, the remaining balance of the Lease Agreement and Lease Amendment, the entire amount of the Original Allowance and Additional Allowance and all costs and reasonable attorneys' fees incurred.

WHEREFORE, Plaintiff, Morgan Street Partners LLC, prays for the entry of judgment in its favor and against Defendant, Chicago Climbing Gym Company LLC, as follows:

A.  Awarding $229,102.55 in actual damages for lost rent;

B.  Awarding all consequential damages incurred as a result of defendant's failure to comply with the terms of the Lease Agreement and Lease Amendment;

C.  Awarding plaintiff's court costs and reasonable attorneys' fees incurred, including those fees to be incurred after the filing of plaintiff's Complaint;

D.  Awarding plaintiff possession of the premises; and,

3

E.    For such additional relief as the Honorable Court deems appropriate under the circumstances.

## COUNT II – BREACH OF GUARANTEE AGREEMENT

25.    Landlord repeats, re-alleges and incorporates by reference the allegations of paragraphs 1 through 24 as and for paragraph 25 of Count II of this Complaint.

26.    On or about January 15, 2013, the Guarantor agreed to guaranty the obligations of the Tenant under the Lease Agreement with Landlord. This written agreement was set forth in the Guaranty of Lease incorporated with and made part of the Lease Agreement. (*See* Guaranty of Lease attached to the Lease Agreement).

27.    Specifically, the Guarantor agreed that, in the event of breach by of the Lease Agreement, he would fulfill any term, condition, covenant or obligation required of the Tenant under the Lease Agreement. (*Id.*).

28.    Moreover, the Guarantor agreed to pay reasonable attorneys' fees and court costs in the event Landlord was forced to employ an attorney due to the Tenant's breach of any term of the Lease Agreement. (*Id.*).

29.    The Tenant breached the terms of the Lease Agreement by failing to pay Landlord $229,102.55 in rent.

30.    Moreover, the Tenant is liable for the entire amount of the Original Allowance and Additional Allowance under the Lease Agreement and Lease Amendment.

31.    Landlord complied with all of its terms and requirements set forth in the Lease Agreement and Lease Amendment.

32.    The Guarantor breached the terms of the Guaranty of Lease by failing to pay the amounts owed to Landlord by the Tenant.

33.    Landlord has incurred damage and is entitled to recovery from the Guarantor due to his breach of the terms of the Guaranty of Lease.

EXHIBIT

WHEREFORE, Plaintiff, Morgan Street Partners LLC, prays for the entry of judgment in its

favor and against Defendant, Jeremy Balboni, as follows:

A.   Awarding plaintiff $229,102.55 in actual damages;

B.   Awarding plaintiff for consequential damages incurred as a result of defendants' failure
     to comply with the terms of the Guaranty Agreement;

C.   Awarding plaintiff's court costs, interest and reasonable attorneys' fees incurred,
     including those fees to be incurred after the filing of plaintiff's Complaint; and,

D.   For such additional relief as the Honorable Court deems appropriate under the
     circumstances.

Respectfully submitted,

Morgan Street Partners LLC,

By: /s/ Michael T. Franz
       One of Plaintiff's Attorneys

Michael T. Franz
Sanchez Daniels & Hoffman LLP
333 West Wacker Drive
Suite 500
Chicago, Illinois 60606
(312) 214-3043
mtfranz@sanchezdh.com
Firm No: 42258

Date: July 2, 2020

*Attorneys for Plaintiff*

NPL 75235

5

**EXHIBIT**

I.

## VERIFICATION

I, Drew Trammell, as the Asset Manager for Morgan Street Partners LLC, under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, certify that the statements set forth herein are true and correct.

*Drew Trammell*

Drew Trammell



## SPACE LEASE AGREEMENT

THIS SPACE LEASE AGREEMENT (the "**Lease**") is made and entered into as of the __ day of January, 2013, by and between 100 S. MORGAN, LLC, an Illinois limited liability company ("**Landlord**"), whose address for purposes hereof is c/o Echelon Capital, LLC, 121 West Wacker, Suite 2156, Chicago, Illinois 60601, and CHICAGO CLIMBING GYM COMPANY, LLC ("**Tenant**"), whose address for purposes hereof is 2801 Lakeside Drive, Suite 207, Bannockburn, IL 60015.

## W I T N E S S E T H:

In consideration of the payments of rents and other charges provided for in this Lease, the covenants and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant and agree as follows:

1.        PREMISES: Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon the terms and conditions hereinafter set forth, 22,500 rentable square feet of interior space as shown for illustrative purposes on the site plan attached hereto as **EXHIBIT A**, being all of the interior space in two adjoining one-story buildings, plus all of the exterior space, on 25,988 square feet of land at 100 South Morgan Street, Chicago, Illinois, shown as Parcels 1, 2, 3, 4 and 5 on the Survey dated July 25, 2011 by National Survey Service, Inc. attached hereto as part of **EXHIBIT A** (collectively the "**Building**"), which includes the adjacent parking lot shown on said survey (the "**Parking Lot**"). The land, Building and the Parking Lot shall be collectively known as the "**Premises.**"

2.        TERM: This Lease shall be for a term (the "**Term**") of one hundred eighty-five (185) months commencing on the date hereof (the "**Commencement Date**") and expiring on June 30, 2028 (the "**Expiration Date**"), unless sooner terminated as provided herein, and further subject to Tenant's right to extend the Lease as set forth in Section 35 hereof.

3.        DELIVERY OF PREMISES; ALLOWANCES.

A.        Delivery of Premises and Construction. Landlord has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, the Building, or any part thereof, and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant. Landlord shall deliver the Premises in a clean state, free of all tenants, occupants, personal property, trash and debris.

B.        Delivery of Premises. Landlord has no obligation and has made no promises to alter, remodel, improve, renovate, repair or decorate the Premises, the Building, the Parking Lot or any part thereof. No representations or warranties respecting the condition of the Premises, the Building or the Parking Lot have been made by Landlord to Tenant. Tenant is accepting possession of the Premises, the Building and the Parking Lot in their "as is" condition.

C.        Construction. Tenant agrees that it shall construct (referred to as "**Tenant's Work**"), at the cost and expense of Tenant, utilizing, among other funds, the Landlord's Allowance (as defined in Section 3D(i) below), certain tenant improvements for the Premises in a good and workmanlike manner substantially in accordance with the construction drawings and plans (the "**Approved Drawings**") which will be prepared by DePalma Group, 935 W. Chestnut Street, Chicago, IL 60642, or by another licensed architect chosen by Tenant and Landlord.    The Approved Drawings will be approved by both Landlord and Tenant, and the cost and expenses of the Approved Drawings will be borne by Tenant.    Landlord shall not unreasonably withhold, condition or delay said approval.    Landlord shall not be obligated to perform any work other than as expressly provided for herein. In constructing the Tenant's Work, the Tenant will receive bids from a minimum of three (3) vendors for each component of the Tenant's Work. Tenant will obtain Landlord's written approval for variances from the Approved Drawings, which approval

shall be provided within five (5) business days of Tenant's request for same. Said approval shall not be unreasonably withheld, conditioned or delayed by Landlord.

    D.    <u>Allowances</u>.

    (i)    Landlord shall provide up to $625,000 (the "**Original Allowance**") plus $100,000 (the "**Additional Allowance**," and together with the Original Allowance, collectively, the "**Allowance**") as a tenant improvement allowance to be applied to the construction costs, fit-out and finish of the Premises based on actual invoices. The payment of the Allowance will be made within three (3) business days upon Landlord's receipt of actual invoices for labor and services performed and materials furnished.

    (ii)    Tenant will repay the Additional Allowance, plus interest, in eleven (11) installments of $10,000 each, with the first payment on February 1, 2014, and successive installments on the first day of each calendar month thereafter with the last payment on December 1, 2014. The monthly payments are based on the Additional Allowance of $100,000, and Tenant acknowledges that the eleven (11) installments will total a repayment of $110,000. The repayment of the Additional Allowance shall be deemed "**Additional Rent**" hereunder.

    E.    <u>Zoning; Permits</u>.

    (i)    Landlord hereby waives the requirement that Tenant post a $50,000 TI deposit.

    (ii)    To the extent the Building (including HVAC units) does not exceed 50 feet in height, Landlord hereby represents and warrants that the Building and Tenant's Use (as set forth in Section 7) does not violate any City of Chicago zoning ordinances affecting the Building, and that Tenant's Use does not require parking spots under the City of Chicago zoning ordinances in addition to those specified in Section 41. In the event of a breach of this representation and warranty, Tenant shall have the right to terminate this Lease in accordance with Section 17A and Landlord will promptly return the entire Security Deposit and all Rent paid by Tenant to Landlord.

    (iii)    Tenant, at its sole cost and expense, will obtain the necessary building permits to perform the Tenant's Work based on the Approved Drawings. Tenant will use commercially reasonable efforts to obtain the necessary building permits for the Tenant's Work.

    4.    <u>RENT</u>:

    A.    <u>Base Rent</u>: Landlord and Tenant acknowledge and agree that Base Rent is calculated based upon the Premises containing 22,500 rentable square feet. Base Rent shall be payable during the term hereof as follows:

| Year | Month | Base Rental Rate | Monthly Base Rent | Annual Base Rent |
|------|-------|------------------|-------------------|------------------|
|  | Until 6/30/13 | $0 per rentable square foot | -- | -- |
| 1 | 7/1/13 – 6/30/14 | $19.00 per rentable square foot | $ 35,625.00 | $ 427,500.00 |
| 2 | 7/1/14 – 12/31/14 | $19.57 per rentable square foot | $ 36,693.75 | $ 403,631.25 |
|  | 1/1/15 – 2/28/15 | $9.79 per rentable square foot | $ 18,346.88 |  |
|  | 3/1/15 – 6/30/15 | $19.57 per rentable square foot | $ 36,693.75 |  |
| 3 | 7/1/15 – 6/30/16 | $20.16 per rentable square foot | $ 37,794.56 | $ 453,534.75 |
| 4 | 7/1/16 – 6/30/17 | $20.76 per rentable square foot | $ 38,928.40 | $ 467,140.79 |
| 5 | 7/1/17 – 6/30/18 | $21.38 per rentable square foot | $ 40,096.25 | $ 481,155.02 |
| 6 | 7/1/18 – 6/30/19 | $22.03 per rentable square foot | $ 41,299.14 | $ 495,589.67 |
| 7 | 7/1/19 – 6/30/20 | $22.69 per rentable square foot | $ 42,538.11 | $ 510,457.36 |
| 8 | 7/1/20 – 6/30/21 | $23.37 per rentable square foot | $ 43,814.26 | $ 525,771.08 |
| 9 | 7/1/21 – 6/30/22 | $24.07 per rentable square foot | $ 45,128.68 | $ 541,544.21 |
| 10 | 7/1/22 – 6/30/23 | $24.79 per rentable square foot | $ 46,482.54 | $ 557,790.54 |
| 11 | 7/1/23 – 6/30/24 | $26.53 per rentable square foot | $ 49,736.32 | $ 596,835.87 |
| 12 | 7/1/24 – 6/30/25 | $27.32 per rentable square foot | $ 51,228.41 | $ 614,740.93 |
| 13 | 7/1/25 – 6/30/26 | $28.14 per rentable square foot | $ 52,765.26 | $ 633,183.15 |
| 14 | 7/1/26 – 6/30/27 | $28.98 per rentable square foot | $ 54,348.22 | $ 652,178.64 |
| 15 | 7/1/27 – 6/30/28 | $29.85 per rentable square foot | $ 55,978.66 | $ 671,743.99 |

The "**Rent Commencement Date**" shall be July 1, 2013. Except for the first payment of Base Rent which is due on the Rent Commencement Date, Base Rent shall be payable on the first day of each month during the Term of this Lease commencing on the Rent Commencement Date and on the first day of each month thereafter throughout the Term. Each payment is to be made without any offset or deduction whatsoever, except as expressly provided herein, in lawful money of the United States of America, at Landlord's address specified above or elsewhere as designated from time to time by Landlord's written notice to Tenant. Tenant shall be directly responsible for all utilities utilized by the Premises beginning on the Commencement Date, and there shall be no abatement with respect to such utilities and other costs incurred by Tenant from and after the Commencement Date.

B. _Operating Expenses_. Beginning on the Rent Commencement Date, the Tenant covenants to directly pay, or reimburse Landlord for, one hundred percent (100%) of the Operating Expenses actually incurred with respect to the Premises. If Landlord pays Operating Expenses, Tenant shall reimburse Landlord on demand, and such demand shall not be more often than once a month.

"**Operating Expenses**" means operating expenses related to the Premises, including but not limited to the following costs and expenses: (a) the cost of insurance reasonably carried by the Landlord with respect to the Premises and the cost of any commercially reasonable deductible amount paid by the Landlord in connection with each claim made by the Landlord under such insurance; and (b) the cost of providing security, fire protection and fire monitoring services, snow removal, landscaping, Morgan street parking fees to or for the Premises. This is a "triple net lease" and Landlord and Tenant do not expect that Landlord will have any property management costs, but to the extent Landlord becomes responsible (at Tenant's election) for costs and expenses related to the operation of the Premises, Landlord will access, and Tenant will pay, a market fee for such services.

C.      Utility Charges.  Tenant shall be solely responsible for and pay when due, all charges for heat, light, water, sewer, gas, telephone, trash, electricity or any other utility services used or consumed in the Premises (collectively, "**Utilities**"), however, Landlord shall be solely responsible for paying all meters, submeters, meter installation and service connections with respect to gas and electric, if needed, including a new electrical panel, if needed.  Landlord represents that the connections for water exist and are operational.

D.      Taxes.  Beginning on the Rent Commencement Date, Tenant agrees to pay to Landlord during each calendar year during the Term, as additional rent, the Taxes (as hereinafter defined) for such year.  The term "**Taxes**" shall mean and include any and all taxes, assessments and other governmental charges, general and special, ordinary and extraordinary, of any kind and nature whatsoever, on all land, buildings and improvements (including the Premises), including, but not limited to, all rental or rental use taxes related to the Premises assessed by any governmental authority whether measured by Tenant's gross rental payments or otherwise, which shall during the Term hereby demised be laid, assessed, levied, imposed upon or become due and payable and a lien upon the Premises or any part thereof.  To the extent Landlord or Tenant desire, in each party's sole reasonable business judgment, to contest the imposition of any Taxes against the Premises, said contesting party shall proceed with such protest in accordance with applicable law.  There shall be deducted from Taxes the amount of any Taxes refunded in any lease year, provided said refund relates to an assessment year included within the Term of the Lease.

E.      Additional Rent.  Beginning on the Rent Commencement Date, Tenant covenants to pay and discharge when the same shall become due, as additional rent ("**Additional Rent**"), all amounts, liabilities and obligations which Tenant has assumed or agreed to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added for nonpayment or late payment thereof.  Landlord is to indicate whether the Premises is benefiting from any tax abatements, incentives from utility providers, or other cost reductions which may cause a significant increase or decrease in Operating Expenses, utility charges or taxes should any of these abatements, incentives or reductions occur during the Term of this Lease, as it may be extended.  Any decreases in said abatements, incentives or reductions shall be used to reduce the amount of Rent paid by Tenant.

F.      Definition of "Rent"; Net Lease.  All amounts due and payable from Tenant to Landlord hereunder, including (without limitation) all Base Rent, Operating Expenses, Taxes, Utilities and Additional Rent will be referred to as "**Rent**."  This is a net lease and the Rent shall be paid without notice, demand, setoff, counterclaim, deduction or defense and without abatement or suspension, except as otherwise expressly provided herein.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, except as otherwise expressly provided herein.

G.      Late Fees:  For any Rent that remains unpaid for five (5) days after written notice of nonpayment, Tenant shall pay default interest thereon computed from the due date at a rate equal to the lesser of: (i) ten percent (10%) per annum, or (ii) the highest rate permitted by law.

H.      Security Deposit.  Upon execution of this Lease, Tenant shall deposit into an interest-

bearing account with Landlord a "**Security Deposit**" in the amount of $142,500. Provided that Tenant has paid all amounts due under this Lease in a timely manner and otherwise performed all obligations hereunder, the Security Deposit will be returned to Tenant with all accrued interest according to the following schedule:

      (i)     $35,625 within thirty (30) days after the third anniversary of the Commencement Date.

      (ii)    $35,625 within thirty (30) days after the fourth anniversary of the Commencement Date.

      (iii)   $35,625 within thirty (30) days after the fifth anniversary of the Commencement Date.

      (iv)   $35,625 within thirty (30) days after the end of the Term.

In the event that Tenant defaults under any provision of this Lease, after the expiration of any applicable cure period, Landlord may apply all, or any part of the Security Deposit to amounts owed by Tenant. In the event Landlord elects to apply the Security Deposit as provided for above, Tenant shall promptly restore such Security Deposit to the original amount. Landlord may not commingle such funds with its other funds, and shall hold the funds in a commercially reasonable interest-bearing account. Upon any sale or other conveyance of the Building, Landlord will transfer the Security Deposit (or any amount of the Security Deposit then remaining) to the successor owner of the Premises, and Tenant agrees to look solely to said successor owner for repayment of the same, unless Landlord fails to adhere to the terms of this Section 4.H.

     5.     UTILITIES:  Gas, electric (1,200 amps), and water/utility services will be separately metered by Landlord, and Tenant shall pay all charges, costs and expenses for utilities services associated with the Premises directly to the appropriate provider with no mark-up to the Landlord. Tenant shall contract directly with the applicable service providers for telephone, trash, data, and such other services as Tenant may require, and pay such charges directly to such service providers. If Tenant cannot contract directly with the applicable service provider, Tenant shall pay throughout the Term (prior to delinquency) all charges and expenses for all utilities provided by Landlord on behalf of Tenant to the Premises to Landlord as Additional Rent hereunder. Notwithstanding the foregoing, or anything herein to the contrary, Landlord shall not be liable to Tenant for any interruption of service of any utility provided to the Premises or Building unless due to the negligence or intentional act of Landlord or an agent, employee, contractor or invitee of Landlord. For any utilities not paid by Tenant, Landlord reserves the right, and Tenant agrees that Landlord has the right, to pay any utility charge on Tenant's behalf and bill Tenant for the same as Additional Rent. Tenant will have the right to install, use and maintain, at its own expense, Tenant owned security devices, the cost of which shall be eligible to be paid for by the Allowance.

     6.     TIME OF PAYMENT: Tenant agrees that Tenant shall promptly pay all Rent at the times and place stated above; and Tenant shall promptly pay any other charges that accrue under this Lease.

     7.     USE:  Tenant shall use the Premises as a recreational "rock climbing" facility and other ancillary uses, including but not limited to retail space, offices, coffee/juice bar and a fitness facility (collectively the "**Use**"). In the event that Tenant uses the Premises for purposes not expressly permitted herein, the Landlord may, in addition to all other remedies available to it, seek to restrain said improper use by injunction.

     8.     QUIET ENJOYMENT: Upon payment by Tenant of the Rent as herein provided, and upon the observance and performance of all terms and provisions on Tenant's part to be observed and performed under this Lease, Tenant shall, subject to all of the terms and provisions of this Lease, peaceably and quietly hold and enjoy the Premises for the Term hereby demised, beginning on the Commencement Date.

9. GOVERNMENTAL AND OTHER REQUIREMENTS:

A. Tenant shall faithfully observe in the use of the Premises all municipal and county ordinances and codes and all state and federal statutes, rules and regulations now in force or which may hereafter be in effect.

B. Landlord shall faithfully observe all municipal and county ordinances and codes and all state and federal statutes, rules and regulations applicable to the Building now in force or which may hereafter be in effect.

10. MAINTENANCE AND REPAIR OF PREMISES: Tenant, at Tenant's own expense will keep and maintain the Premises continuously in a neat and attractive manner, in good repair and in tenantable condition during the Term including, without limitation, flooring, doors, plumbing, equipment fixtures, and all other alterations and improvements whether installed by Landlord or Tenant, reasonable wear and tear excepted. Except as set forth in the following sentence, Landlord shall have the obligation to pay for capital expenditures to replace or repair any structural components of the Building, including but not limited to the roof, exterior walls, foundation and structural supports, as necessary. The parties acknowledge and agree that Landlord shall have absolutely no obligations to maintain, repair or replace any part of the Premises (including structural components) that is part of, or caused by, Tenant's Work, including but not limited to the new roof and skin of the Building.

Tenant will make no alterations, additions or improvements in or to the Premises beyond the Tenant's Work without the prior written consent of Landlord, which shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Tenant may make minor, cosmetic non-structural alterations to the interior of the Premises without the prior written consent of Landlord, not to exceed $25,000. Tenant may conduct ordinary repairs and maintenance at the Premises without Landlord's consent. All such work shall be done in a good and workmanlike manner in accordance with all applicable codes and ordinances. All additions, fixtures or improvements shall be and remain a part of the Premises at the expiration of this Lease. Office furniture, trade fixtures, climbing walls and equipments, security systems and other equipment and any other personal property located on or about the Premises (the "**Tenant's Property**") shall be removed by Tenant, at its cost, prior to the Expiration Date; and Tenant shall at its own expense repair any damage caused to the Premises by such removal. Notwithstanding the foregoing, to the extent any of Tenant's Property is not removed by Tenant prior to the Expiration Date, at Landlord's option, such property shall become the property of Landlord upon the Expiration Date.

Tenant will have access to, and Landlord will assign to Tenant, Landlord's rights in all warranties and guaranties documents and service contracts that are in place for the HVAC system, roof, parking lot, security system, plumbing, electrical system and other systems and elements of the Building and/or the Premises.

Landlord represents and warrants that, and will provide written evidence, that as of the Commencement Date, the current HVAC system and the portion of the roof unaffected by the Tenant's Work at the Premises are not in disrepair and will be in full and working order. The costs and expenses incurred for a breach of the foregoing representation and warranty will be borne by Landlord. Tenant shall be responsible for any on-going maintenance of the HVAC in accordance with Section 37.

11. MECHANICS LIENS: Tenant shall keep the Premises and all parts thereof at all times free of mechanic's liens and any other lien for labor, services, supplies, equipment or material purchased or procured, directly or indirectly, by or for Tenant. Tenant further agrees that Tenant will promptly pay and satisfy all liens of contractors, subcontractors, mechanics, laborers, materialmen, and other items of like character, and will indemnify Landlord against all expenses, costs and charges, including bond premiums for release of liens and reasonable attorneys fees and costs reasonably incurred in and about the defense of any suit in discharging the Premises, from any liens, judgments, or encumbrances caused or suffered by Tenant, other than such liens caused by the Landlord's untimely payment of the Allowance, failure to pay the Allowance, or for work other than the Tenant's Work otherwise requested in writing by

the Landlord. In the event any such lien shall be made or filed, Tenant shall bond against or discharge the same within sixty (60) days after the same had been made or filed. The foregoing notwithstanding, in the event Landlord should be in the process of either selling the Building or refinancing the Building then Tenant shall bond against or discharge an such lien within ten (10) business days after the same had been made or filed. It is understood and agreed between the parties hereto that the expenses, costs and charge above referred incurred by Landlord to shall be considered as Additional Rent dueand shall be included in any lien for Rent.

The Tenant herein shall not have any authority to create any liens for labor or material on the Landlord's interest in the Building and all persons contracting with the Tenant for the construction or removal of any facilities or other improvements on or about the Premises, and all materialmen, contractors, mechanics, and laborers are hereby charged with notice that they must look only to the Tenant and to the Tenant's interests in the Premises to secure the payment of any bill for work done or material furnished at the request or instruction of Tenant.

12.     SUBORDINATION OF LEASE; ATTORNMENT; ESTOPPEL CERTIFICATES: This Lease is subject and subordinate to any and all mortgages now or hereafter encumbering the Building, and to any renewals, extensions and/or modifications thereof, provided that any such mortgage holders first provide to Tenant a commercially reasonable non-disturbance and attornment agreement. In the event Landlord's interest in the Building is transferred by reason of foreclosure or other proceeding for enforcement of any such mortgage, Tenant agrees to attorn to and recognize the rights of the transferee of Landlord's interest in the Building as if such transferee were the Landlord under this Lease. This provision shall be self-operative without the execution of any further instruments. Notwithstanding the foregoing, however, Tenant hereby agrees to execute any commercially reasonable instrument(s) which Landlord may deem desirable to further evidence such attornment and the subordination of this Lease to any and all such mortgages to the extent that the statements in said instrument(s) are true. At the option of the holder of any such mortgage, upon written notice to Tenant, Tenant will simultaneously give to such holder a copy of any and all default notices to Landlord and such holder shall have the right (but not the obligation) to cure or remedy any default of Landlord during the period that is permitted to Landlord hereunder plus an additional thirty (30) days, and Tenant will accept such curative or remedial action (if any) taken by Landlord's mortgagee with the same effect as if such action had been taken by Landlord.

Within ten (10) days after written request by Landlord, Tenant shall deliver in a commercially reasonable form supplied by Landlord, an estoppel certificate to Landlord as to the status of this Lease, including whether this Lease is unmodified and in full force and effect (or, if there have been modifications, whether this Lease is in full force and effect as modified and identifying the modification agreements); the amount of Base Rent and any Additional Rent then being paid and the dates to which same have been paid; whether there is any existing or alleged default by either party, or whether any facts exist which, with the passing of time or giving of notice, would constitute a default and, if there is any such default or facts, specifying the nature and extent thereof; and any other factual matters pertaining to this Lease as to which Landlord shall reasonably request such certificate. Landlord, and any prospective purchaser, lender, or ground lessor shall have the right to rely on such certificate.

13.     ASSIGNMENT AND SUBLETTING:

A.     Assignment and Subletting. Tenant shall not, directly or indirectly, assign, transfer, mortgage, pledge or otherwise encumber or dispose of this Lease or sublet the Premises or any part thereof or permit the Premises to be occupied by other persons other than Tenant without the prior written consent of Landlord, which consent may not be unreasonably withheld, conditioned or delayed in Landlord's sole discretion. Without limiting the foregoing, Landlord will be reasonable in exercising such discretion. Any transfer of the majority control of the interests of Tenant shall be deemed an assignment hereunder, except that the existing members of Tenant may freely transfer interests among themselves or for estate planning purposes (so long as there is no change in control), without the consent of Landlord. Any such transfer made in violation of the terms of this Lease shall be null and void and of no force and effect, and shall be deemed an Event of Default on the part of Tenant. If Landlord grants its consent to

- 7 -

any such transfer or assignment, such consent shall be upon the following conditions: (i) no such assignment or sublease shall relieve Tenant from any liability under this Lease, whether accrued to the date of such assignment or sublease, or thereafter accruing; (ii) such assignee or sublessee expressly assumes, in writing, all of Tenant's obligations under this Lease, in form and content reasonably acceptable to Landlord; (iii) no series of one or more of such transactions shall be used by Tenant to "spin-off" this Lease to independent third parties; (iv) Tenant shall give Landlord fourteen (14) days' prior written notice of any such transaction not requiring Landlord's consent; and (v) the assignee or sublessee has a net worth at least equal to that of the Tenant at the time Tenant executed this Lease.

B.      Overage.  If Landlord approves an assignment or sublease as herein provided, Tenant shall pay to Landlord, as Additional Rent due under this Lease, as applicable: (a) in the case of a sublease, an overage amount equal to fifty percent (50%) of the difference, if any, between the Base Rent allocable to that part of the Premises affected by such sublease pursuant to this Lease, and the Base rent paid by the subtenant to Tenant, less any reasonable and customary expenses incurred by Tenant in connection with the sublease which are approved by Landlord in its sole and absolute discretion, and (b) in the case of an assignment, an overage amount equal to fifty percent (50%) of the consideration, if any, received by Tenant for such assignment less the rent due from Tenant for the Premises.  Such overage amounts shall be due and payable by Tenant to Landlord within fourteen (14) days of Tenant's receipt of payment from the subtenant or assignee.

14.      HOLD HARMLESS:

A.      Hold Harmless of Landlord.  In consideration of the Premises being leased to Tenant for the above Rent, Tenant agrees that Tenant, at all times, will indemnify and hold harmless Landlord from all losses, damages, liabilities and expenses (including reasonable legal fees and court costs at trial and all appellate levels) whatsoever, which may arise or be claimed against Landlord and be in favor of any persons, firms or corporations, for any injuries or damages to the persons or property of any persons, firms or corporations, consequent upon or arising from the use or occupancy of the Premises by Tenant, or employees, or invitees, or consequent upon or arising from Tenant's failure to comply with the terms and provisions of this Lease and/or any laws, statutes, ordinances, codes, regulations, covenants or restrictions as herein provided; and that Landlord shall not be liable to Tenant for any damages, losses or injuries to the persons or property of Tenant which may be caused by the acts, neglect, omissions or faults of any persons, firms or corporations, except to the extent that any of the foregoing results from the negligence or willful misconduct of Landlord or an agent, employee, contractor or invitee of Landlord.  All personal property placed or moved into the Premises shall be at the risk of Tenant or the owner thereof, and Landlord shall not be liable to Tenant for any damage to said personal property.

In case Landlord shall be made a party to any litigation commenced against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and reasonable attorneys fees incurred or paid by Landlord in connection with such litigation and any appeal thereof.

The provisions of this paragraph shall survive the Term of any cancellation or termination of this Lease.

B.      Hold Harmless of Tenant.  Without limiting the terms and provisions in paragraph A above, in consideration of Tenant leasing the Premises for the above Rent, Landlord agrees that Landlord, at all times, will indemnify and hold harmless Tenant from all losses, damages, liabilities and expenses (including reasonable legal fees and court costs at trial and all appellate levels) whatsoever, which may arise or be claimed against Tenant and be in favor of any persons, firms or corporations, for any injuries or damages to the persons or property of any persons, firms or corporations, or consequent upon or arising from Landlord's failure to comply with the terms and provisions of this Lease and/or any laws, statutes, ordinances, codes, regulations, covenants or restrictions as herein provided.

In case Tenant shall be made a party to any litigation commenced against Landlord, then Landlord shall protect and hold Tenant harmless and shall pay all costs, expenses and reasonable

- 8 -

attorneys fees incurred or paid by Tenant in connection with such litigation and any appeal thereof.

The provisions of this paragraph shall survive the Term of any cancellation or termination of this Lease.

15. CASUALTY LOSS: If the Premises shall be damaged by fire or other casualty and if such damage does not render all or a material portion of the Premises untenantable, then Landlord shall repair and restore the Premises to the extent of "available insurance proceeds". For purposes of this Lease, the term "available insurance proceeds" shall mean the portion of the insurance proceeds paid over to Landlord free and clear of any collection by mortgagees for the value of the damage, attorneys' fees and other reasonable costs of compromise, adjustment, settlement and collection of the insurance proceeds.

If any such damage renders all or a material portion of the Premises untenantable for Tenant's Use, or if "available insurance proceeds" are not made available to Landlord, then Tenant (a) shall have the right to terminate this Lease within sixty (60) days of the date of such damage, or (b) elect to restore the Premises. Unless this Lease is terminated as provided in the preceding sentence, Landlord shall proceed promptly to repair and restore the Premises, to the extent of available Insurance proceeds, to substantially the same condition that existed prior to such damage.

For purposes of this Section, a material portion of the Premises shall be deemed to be untenantable if the cost to repair the damaged or destroyed portion of the Premises, as determined by Landlord in its reasonable discretion, is greater than $500,000.00 or if the time to repair such damaged or destroyed portion of the Premises, as determined by Landlord in its reasonable discretion, is greater than nine months.

If this Lease is terminated pursuant to the terms of this Section, Tenant shall assign to Landlord all of Tenant's right, title and interest in and to any insurance proceeds paid or payable on account of such fire or other casualty (except for insurance proceeds for business interruption), and Tenant shall have no obligation to restore or repair the Premises.

Unless the loss was caused by Tenant, Tenant's Rent shall be abated during the period of the repair and restoration by a percentage equal to the percentage of square footage being affected out of the total square footage being leased.

16. CONDEMNATION: If any portion of the Premises is condemned or taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or the parking lot are taken by such condemnation as would substantially or adversely affect Tenant's Use at, or the operation of Tenant's business conducted from, the Premises, Tenant shall have the option, to be exercised only in writing within thirty (30) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession and to have all of Tenant's Security Deposit refunded to Tenant. If a taking is a temporary taking, Tenant's rent shall be abated during said period but Tenant shall not have the right to terminate this Lease unless said temporary taking would substantially or adversely affect Tenant's Use at, or the operation of Tenant's business conducted from, the Premises. If Tenant does not terminate this Lease as permitted pursuant to the terms of this Section, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be reduced in the proportion that the usable floor area of the Premises taken bears to the total usable floor area of the Premises. Landlord shall have the option in its sole discretion to terminate this Lease as of the date of the taking of possession of any material portion of the Premises by the condemning authority, by giving written notice to Tenant of such election within thirty (30) days after receipt of notice of a taking by condemnation of any material portion of the Premises. Any award for the taking of all or any part of the Premises under the power of eminent

9

domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold, for good will, for the taking of the fee, as severance damages, or as damages for tenant improvements; provided, however, that Tenant shall be entitled to seek compensation directly from the condemning authority, and shall be entitled to any separate award for loss of or damage to Tenant's fixtures and personal property and for moving expenses and for the unamortized cost of any improvements paid for by Tenant. In the event that this Lease is not terminated by reason of such condemnation, and subject to the requirements of any lender that has made a loan to Landlord encumbering the Premises, Landlord shall to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Premises caused by such condemnation in a timely manner.

17.     DEFAULT:  If any one or more of the following events (herein sometimes called an "**Event of Default**") shall happen:

(a)     if default shall be made in the payment of any Rent or other charges herein reserved upon the date the same become due and payable and such default continues for a period of ten (10) business days after written notice of nonpayment; or

(b)     if default shall be made by Tenant in the performance of or compliance with any of the other covenants, agreements, terms or conditions contained in this Lease (except failure to pay Rent as provided in subparagraph 17(a) above), and such default shall continue for a period of twenty (20) days after written notice thereof from Landlord to Tenant; provided, however, if such default cannot reasonably be cured within twenty (20) days, and Tenant, within said twenty (20) day period, shall have commenced and thereafter continues diligently to prosecute the cure of such default to completion, said default shall not constitute an Event of Default so long as such Event of Default is cured within sixty (60) days; or

(c)     if Tenant shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, wage earner's plan, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other debtor's relief statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Tenant or of all or any substantial part of Tenant's properties or of the Premises; or

(d)     if within ninety (90) days after commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other debtor's relief statute or law, such proceeding shall not have been dismissed, or stayed on appeal, or if, within ninety (90) days after the appointment, without the consent or acquiescence of Tenant, of any trustee, receiver or liquidator of Tenant or of all or any substantial part of Tenant's properties or of the Premises, such appointment shall not have been vacated or stayed on appeal or otherwise, or if, within ninety (90) days after the expiration of any such stay such appointment shall not have been vacated; or

(e)     if the Premises shall be seized under any levy, execution, attachment or other process of court against Tenant and the same shall not be promptly vacated or stayed on appeal or otherwise, or if the Tenant's interest in the Premises is sold by judicial sale and the sale is not promptly vacated or stayed on appeal or otherwise; or

(f)     if Tenant:

I.     should assign this Lease or sublet the Premises or any portion thereof in violation

- 10 -

of paragraph 13 of this Lease, or

II.     should vacate, abandon, or desert the Premises or any portion thereof without continuing to pay Rent, or

III.    should violate any material covenant or obligation under this Lease.

then in any such event Landlord may at any time thereafter terminate this Lease and retake possession, declare the balance of the entire Base Rent for the first ten years of the term of this Lease to be immediately due and payable (in which event Landlord may then proceed to collect all of the unpaid Base Rent called for by this Lease, reduced to present value and subject to a credit for reletting), or pursue any other remedy afforded by law or equity, provided that such default and all other defaults at the time existing have not been fully cured, and all expenses and costs incurred by the Landlord, including reasonable administrative, collection and attorneys' fees and court costs, at trial and all appellate levels, in connection with enforcing this Lease, shall not have been fully paid. Any such termination shall apply to any extension or renewal of the term herein demised, and to any right or option on the part of the Tenant that may be contained in this Lease or any other agreement. Nothing herein contained shall be construed as precluding the Landlord from having such lawful remedy as may be and become necessary in order to preserve the Landlord's right or the interest of the Landlord in the Premises and in this Lease, even before the expiration of the grace or notice periods provided for in this Lease, if under particular circumstances then existing the allowance of such grace or the giving of such notice will prejudice or will endanger the rights and estate of the Landlord in this Lease or in the Premises. All rights and remedies granted in this Lease to Landlord or available at law or equity shall be cumulative and not mutually exclusive.

If Landlord elects to terminate this Lease and retake possession in accordance with the preceding paragraph, Landlord will use reasonable efforts to relet the Premises or any part thereof, alone or together with other premises, for such term or terms (which may be greater or less than the period which otherwise would have constituted the balance of the Term) and on such terms and conditions (which may include concessions or free rent and alterations of the Premises) as Landlord, may reasonably determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any rent due upon such reletting, despite Landlord's best efforts to relet the Premises for at least the amount of Rent due from Tenant under the Lease.

Notwithstanding anything to the contrary contained in this Lease, in the event that Landlord provides written notice of an Event of Default to Tenant more than two (2) times in any twelve (12) month period and such defaults have had a material adverse effect on Landlord, Landlord has the right to terminate this Lease and/or Tenant's right to possession of the Premises upon Landlord's delivery of written notice of such termination to Tenant.

17A.    **DEFAULT BY LANDLORD**:  Landlord shall not be in default under this Lease unless Landlord fails to perform obligations required of Landlord within sixty (60) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust encumbering the Premises whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than sixty (60) days are reasonably required for its cure, then Landlord shall not be in default if Landlord commences performance within the sixty (60) day period and thereafter diligently pursues the same to completion.  Tenant may exercise any remedies available at law or in equity, but in no event shall Tenant have the right to terminate this Lease as a result of Landlord's default, unless such default by Landlord has had a material adverse effect on Tenant, in which case Tenant will have the right to terminate this Lease by delivering written notice of such termination to Landlord.

18.     **WAIVER OF DEFAULT**:  Failure of Landlord or Tenant to declare any default immediately upon occurrence thereof, or delay in taking any action in connection therewith, shall not

waive such default, but Landlord and Tenant shall have the right to declare any such default at any time and take such action as might be lawful or authorized hereunder, in law and/or in equity. No waiver of any term, provision, condition or covenant of this Lease by Landlord or Tenant shall be deemed to imply or constitute a further waiver by Landlord or Tenant of any other term, provision, condition or covenant of this Lease and no acceptance of Rent or other payment shall be deemed a waiver of any default hereunder.

19.    RIGHT OF ENTRY: Upon twenty four (24) hours prior notice (which may be by telephonic notice; and except in the case of an emergency, when no prior notice shall be required), Landlord, or any of its agents shall have the right to enter the Premises during all reasonable business hours to examine the same, or to otherwise exhibit the Premises to third parties, including, without limitation, mortgagees, lessees, purchasers, insurance examiners and building inspectors. Tenant shall have the right to have a representative of Tenant accompany Landlord with respect to any permitted entry onto the Premises.

20.    INSURANCE:

A.    Liability Insurance. During the Term, as it may be extended, Tenant shall maintain in effect:

(a)    Commercial General Liability insurance insuring Tenant against liability for bodily injury, property damage and personal injury at the Premises, including contractual liability insuring the indemnification provisions contained in this Lease. Such insurance shall be for a limit of not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) annual aggregate. Coverage shall also be included for fire damage (damage to rented premises) for a limit of $300,000 for any one fire.

(b)    A one million dollar ($1,000,000) umbrella policy.

Such insurance shall name Landlord, and any mortgagee of which Tenant has been given written notice by Landlord, from time to time, as additional insureds. The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease. Landlord may also obtain commercial general liability insurance in an amount and with coverage determined by Landlord insuring Landlord against liability with respect to the Premises.

B.    At all times when Tenant's Work is in process, Tenant shall require all contractors and subcontractors to maintain the general liability, casualty, workers compensation and motor vehicle insurance.

C.    General Insurance Provisions. Prior to the earlier of Tenant's entry into the Premises or the Commencement Date and prior to the expiration of any policy, Tenant shall furnish Landlord certificates evidencing that all required insurance is in force and shall provide Landlord with replacement certificates at least thirty (30) days prior to any cancelation or change in any such policies.

21.    NOTICE: Any notice to be given the Landlord as provided for in this Lease shall be in writing and shall be sent to the Landlord by United States certified mail, postage prepaid, return receipt requested, addressed to Landlord at Landlord's office at the address set forth on page 1 hereof, hand delivered or delivered by overnight courier service, to address of at such office, or delivered by facsimile, with such notices being deemed delivered upon confirmation of transmission with a copy to be sent via United States Mail. Any notice to be given Tenant under the terms of this Lease, shall be in writing and shall be sent by United States certified mail, postage prepaid, return receipt requested, or hand delivered or delivered by overnight courier service, to the Tenant at the address set forth on page 1 hereof. Either party, from time to time, by such notice, may specify another address to which subsequent notice shall be sent. Any notice given by mail shall be deemed given 3 days following the date of mailing if mailed, or upon receipt or refusal of delivery if hand delivered or delivered by overnight courier service.

- 12 -

22.   CONDITION OF PREMISES ON TERMINATION OF LEASE AND HOLDING OVER: Tenant agrees to surrender to Landlord, at the end of the Term of this Lease and/or upon any cancellation or early termination of this Lease, the Premises in as good condition as the Premises were at the beginning of the Term of this Lease, ordinary wear, tear and casualty excepted. Tenant agrees that if Tenant does not surrender the Premises to Landlord at the end of the Term of this Lease, then Tenant will pay to Landlord, two hundred percent (200%) of the amount of the Base Rent paid by Tenant for the last full month of the Term for each month thereafter. At all times, Tenant will indemnify and save Landlord harmless from and against all claims made by any succeeding tenant of the Premises against Landlord on account of delay of Landlord in delivering possession of the Premises to the succeeding tenant so far as such delay is directly caused by failure of Tenant to so surrender the Premises in accordance herewith.

Unless otherwise expressly agreed to in writing by Landlord, no receipt of money by Landlord from Tenant after termination of this Lease or the service of any notice of commencement of any suit or final judgment for possession shall reinstate, continue or extend the Term of this Lease or affect any such notice, demand, suit or judgment.

No act or thing done by Landlord or its agents during the Term hereby granted shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it be made in writing and signed by a duly authorized officer or agent of Landlord.

All agreements entered into by Tenant to provide Utilities to the Premises shall be terminated by Tenant prior to the expiration of the Term, or shall be assigned to Landlord, if requested by Landlord. Tenant will indemnify and save Landlord harmless from and against any loss, cost, or expense that may be suffered by Landlord as a result of Tenant's failure to terminate such Utilities.

23.   HAZARDOUS SUBSTANCES: Landlord and Tenant shall not cause or permit the violation of any law relating to industrial hygiene or environmental conditions in connection with the Premises, including soil and ground water conditions, or use, generate, manufacture, store or dispose of any Hazardous Substances (as defined below) on, under or about the Premises other than in full compliance with applicable Environmental Laws (as defined below). Without Landlord's prior written consent, Tenant shall take no remedial action with respect to any Hazardous Substance on, under or about the Premises, and shall not enter into any settlement agreement, consent decree or other compromise or agreement relating to any such Hazardous Substance, except for emergency actions or actions required by governmental authority.

Tenant shall indemnify and hold Landlord harmless from any loss, liability, cost, expense and/or claim (including without limitation the cost of any fines, remedial action, damage to the environment and clean up and the fees and costs of attorney and other experts) arising from the use, release or disposal of any Hazardous Substance on, under or about the Premises by Tenant or the transport of any Hazardous Substances to or from the Premises by Tenant; and the violation by Tenant of any law, rules or regulations relating to industrial hygiene or environmental conditions in connection with the Premises, including soil and ground water condition; the breach of any of the representations, warranties and covenants of Tenant with respect to Hazardous Substances, and the actual or alleged contamination by Tenant of the Premises by Hazardous Substances. The indemnification and hold harmless provisions of this section will survive termination or any earlier cancellation of this Lease.

Landlord shall indemnify and hold Tenant harmless from any loss, liability, cost, expense and/or claim (including without limitation the cost of any fines, remedial action, damage to the environment and clean up and the fees and costs of attorney and other experts) arising from the violation by Landlord of any law, rules or regulations relating to industrial hygiene or environmental conditions in connection with the Premises, including soil and ground water condition; the breach of any of the representations, warranties and covenants of Tenant with respect to Hazardous Substances; the actual or alleged contamination by Landlord of the Premises by Hazardous Substances; or the presence of any environmental contamination or hazard at the Premises from any source other than Tenant. The

indemnification and hold harmless provisions of this section will survive termination or any earlier cancellation of this Lease.

For purposes of this paragraph 23, "**Hazardous Substance(s)**" means any substance or material defined or designated as a hazardous or toxic waste material or substance, or other similar term by any federal, state or local environmental statute, regulation or ordinance presently or hereafter in effect ("**Environmental Laws**"), as such Environmental Laws may be amended from time to time, however, such terms shall not include normal cleaning and construction products, and products associated with Tenant's Use.

24.　　INTENTIONALLY OMITTED.

25.　　TRIAL BY JURY: It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Premises. Tenant further agrees that the provisions for payment of Rent herein are independent covenants of Tenant and Tenant shall not interpose any noncompulsory counterclaim or counterclaims in a summary proceeding to remove Tenant from possession based upon non-payment of Rent or any other payment required of Tenant hereunder.

26.　　INVALIDITY OF PROVISION: If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term or provision, to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and be enforceable to the fullest extent permitted by law. This Lease shall be construed in accordance with the laws of the State of Illinois.

27.　　TIME OF ESSENCE: It is understood and agreed between the parties hereto that time is of the essence of all the terms and provisions of this Lease. However, whenever a period of time is herein prescribed for the taking of any action by Landlord or Tenant, then Landlord or Tenant, as applicable, shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, terrorism, legal requirements, or any other cause whatsoever beyond the control of Landlord or Tenant, as applicable. The foregoing force majeure provisions of this paragraph are applicable to any payments of Rent or other monies due from Tenant under this Lease.

28.　　SUCCESSORS AND ASSIGNS: All terms and provisions of this Lease to be observed and performed by Landlord and Tenant shall be applicable to and binding upon their respective successors and assigns, subject, however, to the restrictions as to assignment and subletting by Tenant as provided herein. All expressed covenants of this Lease shall be deemed to be covenants running with the land.

29.　　ATTORNEYS FEES: If either party defaults in the performance of any of the terms or provisions of this Lease and by reason thereof the other party employs the services of an attorney to enforce performance of the covenants, or to perform any service based upon defaults, then in any of said events the prevailing party shall be entitled to receive from the other party reasonable attorneys fees and all expenses and costs incurred by the prevailing party pertaining thereto (including costs and fees relating to any appeal) and in enforcement of any remedy.

30.　　RELATIONSHIP OF PARTIES: Nothing in this Lease shall be deemed to create a partnership or joint venture between Landlord and Tenant, the parties intending their relationship hereunder to be solely that of landlord and tenant. In addition, Landlord and Tenant expressly negate and disclaim any intention that this Lease be construed as a security instrument or equitable mortgage, the parties intending their relationship hereunder to be solely that of landlord and tenant.

31    MISCELLANEOUS:  The terms Landlord and Tenant as herein contained shall include singular and/or plural, masculine, feminine and/or neuter, wherever the context so requires or admits. The "Landlord" shall be the owner of the Premises from time to time, and upon any sale of the Premises by the present owner, the new owner shall upon acceptance of a deed of conveyance become bound and liable as Landlord under all of the terms and provisions hereunder (including any obligation to return the Security Deposit) and the former owner shall automatically be released from all obligations to the Tenant hereunder.  The terms of this Lease shall run with the land, and this Lease shall survive Landlord's sale or other conveyance of the Premises.  The terms and provisions of this Lease are expressed in the total language of this Lease and the paragraph headings are solely for the convenience of the reader and are not intended to be all inclusive and shall not be deemed to limit or expand any of the provisions of this Lease.  Any formally executed addendum or rider to or modification of this Lease shall be expressly deemed incorporated by reference herein unless a contrary intention is clearly stated therein.  All exhibits and riders attached to this Lease are hereby incorporated in and made a part hereof.

32.    BROKERAGE:  Landlord and Tenant jointly agree that, other than Cora Properties, Inc. and UGL Services (collectively, "**Broker**"), there is no real estate broker responsible for the procurement of this transaction and that Tenant and Landlord each represent and warrant to the other that neither has had any dealings or entered into any agreements with any person, entity, broker or finder other than Broker in connection with the negotiation of this Lease, and no other broker, person, or entity other than Broker is entitled to any commission or finder's fee in connection with the negotiation of this Lease, and Tenant and Landlord each agree to indemnify, defend and hold the other harmless from and against any claims, damages, costs, expenses, attorneys' fees or liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party other than Broker by reason of any dealings, actions or agreements of the indemnifying party.  The provisions of this Section shall survive the expiration or sooner termination of this Lease.  Notwithstanding anything provided in any brokerage agreement to the contrary, no brokerage fees will be paid until the Rent Commencement Date, and the calculation of the brokerage fees will be on the basis of a ten year term.

33.    SIGNAGE.  All Tenant signage is subject to Landlord's approval following Landlord's receipt from Tenant of plans and specifications relative to same, which may not be unreasonably withheld, conditioned or delayed.  Upon receipt of Landlord's approval, the costs of installing Tenant's signage shall be paid for by Tenant, and any future changes or modifications thereto shall be at Tenant's sole cost and expense.  All work performed under this Section shall comply and be performed in accordance with the provisions of this Lease, and all applicable building codes, laws, ordinances, rules, regulations and other governmental requirements in connection with such signage permitted hereunder, and Tenant shall be solely responsible for any fines, fees, violations or repairs in connection with Tenant's signage.

34.    MARKETING OF BUILDING.  Landlord and its agents shall have to the right to enter the Premises upon reasonable prior notice to Tenant to show the Premises and market the Building for sale; provided, however, Landlord shall not place signs marketing the Premises or Building on the windows or doors of the Premises. Tenant agrees to cooperate with Landlord and its agents during any such showing of the Premises, and to not impede or interfere with Landlord or its agents during any such showing, provided that Landlord and its agents shall not interfere or materially interrupt Tenant's right to use and occupy the Premises during any such showing and that Landlord or its agents, during any such showing, agree to cooperate with the Tenant representative, who shall accompany Landlord or its agents at all times while in the Premises.

35.    RIGHT TO RENEW.  Provided Tenant is not in default under the terms of this Lease beyond any applicable notice and cure periods as provided for herein, Tenant may renew this Lease for one (1) additional period of five (5) years (the "**Extension Term**") on the same terms as provided for in this Lease (except as otherwise set forth in this Section 35), by delivering written notice (the "**Renewal Notice**") of the exercise thereof to Landlord no later than fifteen (15) months prior to the expiration of the Term.  Upon Tenant's timely delivery of the Renewal Notice, the Lease shall be extended on the same terms provided in this Lease, except that Base Rent shall be payable at the then-current fair market rate

for buildings of comparable type, class, and location as the Building ("**Extension Term Base Rent**"), with annual 3% escalations and Additional Rent payable as set forth herein. The "fair market rate" shall be suggested by Landlord within twenty (20) business days after Landlord's receipt of the Renewal Notice, and Tenant will then have ten (10) business days to either agree with Landlord's determination of "fair market rate," respond with a different "fair market rate," or revoke its Renewal Notice. Landlord shall lease to Tenant the Premises in their then current condition, and Landlord shall not provide to Tenant any allowances or other tenant inducements other than as the same may expressly be agreed to in writing by the parties. If the parties cannot agree on the "fair market rent," then they shall each appoint a qualified professional appraiser to determine the "fair market rent." If those two appraisers cannot agree on the "fair market rent," then those two appraisers shall agree on a third qualified professional appraiser who shall finally determine the "fair market rent." Landlord and Tenant will use best efforts to agree on the "fair market rent" within twelve (12) months prior to the expiration of the Term.

Tenant's right to extend the term of this Lease for the Extension Term shall terminate if (i) this Lease or Tenant's right to possession of the Premises is terminated, (ii) Tenant, at any time during the Term, assigns any of its interest in this Lease or sublets any portion of the Premises in violation of the terms of this Lease, (iii) Tenant is in default under this Lease that has not been cured, or (iv) Tenant fails to timely provide its Renewal Notice under this Section 35, time being of the essence with respect to Tenant's exercise thereof.

36. LIMITATION OF LIABILITY OF LANDLORD. If, as a consequence of a default by Landlord under this Lease, Tenant recovers a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Premises and out of rent or other income from such property or out of consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title or interest in the Premises, and Landlord shall not be liable for any deficiency. The provisions of this Section 36 are not designed to relieve Landlord from the performance of any of its obligations hereunder, but rather to limit Landlord's liability in the case of a recovery of a money judgment against Landlord. The foregoing limitation shall not apply to or limit any injunctive or other equitable declaratory or other forms of relief which Tenant may be entitled to.

37. TENANT'S HVAC OBLIGATION. Beginning on the Commencement Date, Tenant, at its own expense, shall maintain the heating and cooling system ("**HVAC**") equipment exclusively serving the Premises. Tenant agrees to have said HVAC equipment serviced on a regular basis (at least annually, and filters to be replaced at least quarterly), and to provide Landlord with a copy of its current maintenance contract for such equipment at least annually.

38. INTENTIONALLY OMITTED.

39. ENTIRE AGREEMENT: This Lease contains the entire agreement between the parties hereto and all previous negotiations leading thereto, and the Lease may be modified only by an agreement in writing signed by Landlord and Tenant. Each of Landlord and Tenant acknowledges and agrees that it has not relied upon any statement, representation, prior written or prior or contemporaneous oral promises, agreements or warranties except such as are expressed herein.

40. TIME. Tenant shall have access and use of the Premises twenty-four hours per day, seven days per week and three hundred sixty-five days per year.

A. Financial Statements. On a regular basis but not less frequently than twice per calendar year, Tenant shall deliver to Landlord: (i) complete financial statements of Tenant including a balance sheet, profit and loss statement, statement of changes in financial condition and all other related schedules for the fiscal period then ended; and (ii) income statements for the business of Tenant. All financial statements shall be certified to be accurate and complete by an officer or director of Tenant and all annual financial statement shall be prepared in accordance with sound accounting principles, consistently applied. Tenant understands that Landlord will rely upon such financial statements and

Tenant represents that such reliance is reasonable. In the event that Tenant's property and business are ordinarily consolidated with other businesses for purposes of financial statements, such financial statements will be prepared on a consolidated basis separately showing sales, profits and losses, assets and liabilities with a clear allocation of overhead and other charges. The financial statements delivered to Landlord do not need to be audited, but Tenant shall deliver to Landlord copies of all audited financial statements of Tenant which may be prepared as soon as there are available. Within thirty (30) days after the end of each fiscal year of Tenant, and upon prior written request by Landlord, Tenant shall deliver such compliance certificate to Landlord as Landlord may reasonably require in order to establish that Tenant is in compliance with all of its obligations, duties and covenants under this Lease. To the extent that this reporting requirement causes Tenant undue burden or expense, Landlord will cooperate with Tenant to modify the reporting requirements set forth herein.

41. PARKING. Tenant will have the exclusive rights to all exterior parking spaces (21 surface parking spaces currently striped and 6 to 7 spaces on South Morgan Street with a "loading zone" designation). Landlord is obtaining the necessary permits and approvals, at its own cost and expense, related to the "loading zone" designation and will be responsible for processing, but Tenant will incur all costs and expenses, related to the annual renewal of the "loading zone" designation. Landlord shall have the right to promulgate reasonable rules and regulations with respect to all parking areas serving the Building that shall be binding on Tenant immediately upon notice to Tenant. Said rules and regulations will not interfere with Tenant's Use of the Premises or Tenant's parking. Tenant shall not permit vehicles to be abandoned or stored in the Parking Lot.

42. RIGHT OF FIRST OFFER.

A. If Landlord desires to sell the Premises, Landlord will first give written notice (the "**Sale Notice**") to Tenant of Landlord's desire to pursue such a sale (it being understood and agreed that no offer or proposal to purchase need be pending at the time the Sale Notice is given; however, Landlord will not deliver the Sale Notice unless it intends, in good faith, to sell the Premises). The Sale Notice shall state the minimum price (the "**Minimum Price**") at which the Premises would be sold.

B. For a period of thirty (30) days after the receipt of the Sale Notice (the "Notice Period"), the Tenant, at its option, may advise Landlord in writing if it agrees to purchase the Premises from Landlord at the Minimum Price (the "**Purchase Notice**").

C. If the Tenant does not give a timely Purchase Notice, then Landlord shall be entitled to and is hereby vested with all power and authority to sell the Premises to any third party for a purchase price which is equal to or greater than the Minimum Price, which transaction shall be completed, if at all, on customary market terms within one year after the end of the Notice Period. If the transaction is not completed within one year after the end of the Notice Period, the provisions of this Section shall apply anew.

D. If the Tenant does give a timely Purchase Notice, then within ten (10) business days of the delivery of the Purchase Notice the Tenant shall deposit with any established title company, trust company or banking institution acceptable to Landlord an earnest money deposit in the amount of five percent (5%) of the Minimum Price with joint order escrow instructions that provide for the forfeiture of such funds to Landlord if Tenant fails to close the transaction contemplated in the succeeding paragraph by reason of the default of Tenant and for the refund of such funds to Tenant if the closing fails to occur through no fault of Tenant.

E. If Tenant gave a timely Purchase Notice and has timely deposited the earnest money required by the preceding paragraph, then Tenant shall purchase the Premises from the Landlord for the Minimum Price (subject to prorations and expense allocations as if the Premises were sold in a customary sale transaction). Landlord and Tenant shall close the sale to Tenant at Landlord's principal place of business at a time and on a date (not less than ninety (90) days and not more than one hundred twenty (120) days) after the date the Purchase Notice was given to Landlord.

F.      Without limitation of other rights and remedies, if Tenant gives a Purchase Notice and then defaults on any of its obligation under this Section which default has not been cured under this Lease, then Landlord shall be entitled to and is hereby vested with all power and authority to sell the Premises to any third party without regard to this Section at a price not less than eighty percent (80%) of the Minimum Price for a period of two years from the date of the Sale Notice.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have signed and delivered this Lease in several counterparts each of which shall be deemed an original, but all constituting a single agreement, as of the day and year first above written.

**LANDLORD:**

100 S. MORGAN, LLC,
an Illinois limited liability company

By: Echelon Capital, LLC,
   an Illinois limited liability company

By: _Louis E. Berg_
Name: Louis E. (Gene) Berg
Title: Manager

**TENANT:**

CHICAGO CLIMBING GYM COMPANY, LLC

By: _____
Name: JEREMY BALBONI
Title: MANAGING MEMBER

[SIGNATURE PAGE TO THE LEASE]

## GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "**Guaranty**") is made and entered into as of January 15, 2013, and is given by Brooklyn Boulders LLC ("**Guarantor**") to and for the benefit of 100 S. Morgan, LLC, an Illinois limited liability company ("**Landlord**").

## W I T N E S S E T H:

WHEREAS, simultaneously with the delivery of this Guaranty, Landlord is leasing to CHICAGO CLIMBING GYM COMPANY, LLC ("**Tenant**") by that certain Lease Agreement, dated on or about the date hereof (the "Lease") certain premises located at 100 South Morgan Street, Chicago, Illinois (the "**Premises**") which are more particularly described in said Lease; and

WHEREAS, Landlord is unwilling to enter into the Lease unless Guarantor executes and delivers to Landlord this Guaranty.

NOW, THEREFORE, in order to induce Landlord to enter into the Lease, Guarantor hereby covenants, guarantees, and agrees as follows:

1.      Unless this Lease is terminated by agreement of the parties or Tenant terminates this Lease based on its rights under the Lease, Guarantor hereby guarantees up to $250,000 (the "**Guaranty Cap**") for the payment of Base Rent, Additional Rent and other amounts due under the Lease and the timely performance of all of Tenant's other obligations and covenants pursuant to the Lease, throughout the entire term of the Lease and any option periods, renewals and extensions. The Guaranty Cap will be reduced by $62,500 on the third, fourth and fifth anniversaries of the Commencement Date of the Lease, and will be reduced further by $12,500 on the sixth anniversary of the Commencement Date of the Lease (with a $50,000 Guaranty Cap remaining until the end of the Term).

2.      Any modification of the Lease or waiver of the performance thereof, or the giving by Landlord or any extension of time for the performance of any of the obligations of Tenant, or any other forbearance on the part of Landlord, or any failure by Landlord to enforce any of its rights under the Lease shall not in any way release Guarantor from liability hereunder or affect or diminish the validity of the Guaranty.

3.      Guarantor agrees that in the event of institution by or against Tenant of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, and if in any such proceeding the Lease shall be terminated or rejected, or the obligations of Tenant thereunder shall be modified, Guarantor agrees that it will continue to pay rent and other amounts as they become due and continue to perform all obligations of Tenant under the Lease, but in no event shall Guarantor be liable for any amount above the then-applicable Guaranty Cap. In the event any payment by Tenant to Landlord is held to constitute a preference under the bankruptcy laws, or if for any other reason Landlord is required to refund such payment or pay the amount thereof to any other party, such payment by Tenant to Landlord shall not constitute a release of Guarantor from any liability hereunder, but Guarantor's obligation to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, released or limited in any manner whatsoever by any impairment, modification, release or limitation of the liability of the Tenant or its estate in bankruptcy resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute, or from the decision of any court.

4.      Guarantor shall not be subrogated to any of the rights of Landlord under the Lease or in or to the Premises, or to any other rights of Landlord, by reason of any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its obligations hereunder, and Guarantor will look solely to Tenant for recoupment.

5.      Guarantor waives any defense arising by reason of any disability or other defense of Tenant or by reason of the cessation for any cause whatsoever of the liability of Tenant under the Lease,

- 2 -

and Guarantor shall be liable under this Guaranty notwithstanding any such disability, defense or cessation of the Tenant's liability under the Lease.

6.      Guarantor agrees that in the event this Guaranty is placed in the hands of any attorney for enforcement due to a breach of this Guaranty by the Guarantor, the Guarantor will reimburse Landlord for all expenses incurred by Landlord, including reasonable attorneys' fees and court costs.

7.      This Guaranty shall bind Guarantor and its successors and assigns, and shall inure to the benefit of and be enforceable by Landlord, and Landlord's successors and assigns.

8.      Furthermore, Landlord shall not be required to pursue or exhaust any other remedies before invoking the benefits of this Guaranty; however, any pursuit of any such remedies shall in no manner impair or diminish the rights of Landlord under this Guaranty, except that any monies or other remedies which Landlord collects from Tenant or from any other source shall reduce the amount which Landlord can collect from Guarantor by that amount collected from Tenant or from any other source.

Brooklyn Boulders LLC

By:_____

Name: JEREMY BALBONI
Title: MANAGING MEMBER

[Signature Page to the Lease Guaranty]

- 3 -

Case: 1:20-cv-04468 Document #: 1-1 Filed: 07/30/20 Page 33 of 41 PageID #:37

# EXHIBIT A
## Premises





# FIRST AMENDMENT TO SPACE LEASE AGREEMENT

**THIS FIRST AMENDMENT TO SPACE LEASE AGREEMENT** ("Amendment") is made and entered into as of the ___ day of January, 2015 ("Effective Date"), by and between 100 S. MORGAN, LLC, an Illinois limited liability company ("Landlord") and CHICAGO CLIMBING GYM COMPANY LLC, a Delaware limited liability company ("Tenant").

## WITNESETH:

A.      Landlord and Tenant entered into that certain Space Lease Agreement dated January *15*, 2013 ("Lease") for certain premises consisting of approximately 22,500 rentable square feet of interior space in two adjoining one-story buildings (collectively, "Buiding") plus all exterior space on 25,988 square feet of land at 100 South Morgan Street, Chicago, Illinois ("Land"), which includes the adjacent parking lot ("Parking Lot"), all as further described in the Lease. The Building, Land and Parking Lot shall be collectively be referred to as the "Premises".

B.      The parties desire to amend the Lease upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree to amend the Lease as set forth below.

1.      **Allowances.** Pursuant to Section 3D(i) of the Lease, Landlord has heretofore paid to Tenant, the full Original Allowance in the amount of $625,000, with respect to Tenant's improvement allowance at the Premises, and Tenant hereby acknowledges receipt of the foregoing. Promptly after the date set forth above, Tenant shall provide to Landlord, partial and final lien waivers, if applicable, with respect to work completed at the Premises, together with any other documentation reasonably requested by Landlord to evidence payment and satisfaction of all amounts owed to materialmen and labor with respect to Tenant's improvements at the Premises. In addition to the Original Allowance, Section 3D(i) of the Lease also contemplates the Additional Allowance loan in the principal amount of $100,000 to be repaid by Tenant in accordance with Section 3D(ii) of the Lease. The parties acknowledge and agree that Tenant's improvements to the Premises have been delayed and as a result of the foregoing, the payment and repayment schedule originally contemplated in Section 3D(ii) of the Lease will be adjusted. The parties further acknowledge and agree that Carolyn B. Berg, one of the members of Landlord, will be providing the Additional Allowance loan to Tenant, in lieu of Landlord's obligation to provide such loan, under the terms and conditions set forth in the Note attached hereto and incorporated herein as **Exhibit A** ("Note"). Upon execution of the Note by Tenant and disbursement of the Loan (as defined in the Note) to Tenant, Landlord's obligations under the Lease to provide the Allowance to Tenant shall be deemed satisfied. Promptly after completion of all of Tenant's improvement work at the Premises, Tenant shall provide to Landlord, final lien waivers and a final sworn statement with respect to all such work completed at the Premises, together with any other documentation reasonably requested by Landlord to evidence payment and satisfaction of all amounts owed to materialmen and labor with respect to all of Tenant's improvements at the Premises.

2.      **Default.** If any default shall be made by Tenant under the Note and such default shall continue after any applicable cure period, then such default shall constitute an "Event of Default" as defined in the Lease. If an Event of Default shall occur under the Lease, in addition to all rights and remedies of Landlord set forth in the Lease, the entire amount of the Original Allowance together with any abated rental amounts shall be immediately due and payable to Landlord.

3.      **Loading Zone Designation.** Tenant hereby acknowledges and agrees that Landlord has completed its obligation, set forth in Section 41 of the Lease, to obtain the necessary permits and approvals related to the 'loading zone".

4.      **Brokers.** Landlord and Tenant represent that they have not dealt with any brokers entitled to compensation in connection with the execution of this Amendment.

5.      **Entire Agreement.** The entire agreement of the parties is set forth in this Amendment and in the Lease as amended hereby. Except for the Lease and this Amendment, no prior agreement or understanding with respect

to the Lease and this Amendment shall be valid or of any force or effect. Unless otherwise expressly provided in this Amendment, all capitalized terms used herein shall have the respective meanings ascribed to such terms in the Lease.

6.      **Successors and Assigns; Ratification**. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. Except as herein provided, all the terms and provisions of the Lease shall remain in full force and effect and are hereby ratified and reaffirmed.

7.      **Modification; Caption**. This Amendment may not be modified or amended except by written agreement executed by the parties hereto.

8.      **Severability; Counterparts**. If any provision of this Amendment is found by a court of law to be in violation of any applicable ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such provision to be illegal, void or unenforceable as written, then such provision shall be given force to the fullest possible extent that the same is legal, valid and enforceable and the remainder of this Amendment shall be construed as if such provision was not contained therein. This Amendment may be executed simultaneously or in two or more counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.

9.      **Miscellaneous**. The parties hereto acknowledge that they have been advised by legal counsel of their choice in connection with the interpretation, negotiation, drafting and effect of this Amendment and they are satisfied with such legal counsel and the advice which they have received. This Amendment shall be construed under and governed by the laws of the State of Illinois. The parties hereto agree that the use of facsimile and e-mail (i.e. pdf) signatures for the negotiation and execution of this Amendment shall be legal and binding and shall have the same full force and effect as if originally signed.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Space Lease Agreement as of the day and year first written above.

**LANDLORD:**

100 S. MORGAN, LLC,
an Illinois limited liability company

By:    ECHELON HOLDINGS, LLC,
an Illinois limited liability company

By:    _Louis E. Berg_
Name    Louis E. Berg
Its:    Manager

**TENANT:**

CHICAGO CLIMBING GYM COMPANY LLC,
a Delaware limited liability company

By:    CCG MANAGEMENT COMPANY, LLC,
an Illinois limited liability company

By:    
Name:    Jeremy Balboni
Its:    Managing Member

[First Amendment –Signature Page]

**EXHIBIT A**

**NOTE**

[SEE ATTACHED]

EXHIBIT

3

Jeffrey B. Gurian
jeff@beckergurian.com
Direct: 847-579-6941

Clarity in Commercial Real Estate Law

VIA FEDERAL EXPRESS

May 11, 2020

Chicago Climbing Gym Company, LLC
2801 Lakeside Drive, Suite 207
Bannockburn, IL 60015

# TEN (10) DAY NOTICE OF DEFAULT

RE:

LANDLORD:    Morgan Street Partners, LLC

TENANT:    Chicago Climbing Gym Company,
LLC

LEASED
PREMISES:    100 South Morgan Street, Chicago, IL

DATE OF
LEASE:    January 15, 2013

Dear Tenant:

We represent the Landlord of the above Leased Premises. As counsel, we are advising you that you are in default of the above referenced Lease as a result of your failure to satisfy your obligation to pay rent and other charges, all of which are described in said Lease.

The arrearage through May 31, 2020 is $113,913.20 and this represents rent and charges due for the months of April, 2020 and May, 2020. This amount is broken down as follows:

| | |
|---|---|
| April 2020 Base Rent | $42,583.11 |
| April 2020 RET | 13,462.49 |
| April 2020 Insurance | 306.00 |
| April 2020 CAM | 650.00 |
| May 2020 Base Rent | 42,583.11 |
| May 2020 RET | 13,462.49 |
| May 2020 Insurance | 306.00 |
| May 2020 CAM | 650.00 |



Clarity In Commercial Real Estate Law

Chicago Climbing Gym Company, LLC
May 11, 2020
Page 2

Total Due                                    $113,913.20

ONLY FULL PAYMENT OF ALL AMOUNTS DEMANDED IN THIS NOTICE WILL INVALIDATE THIS DEMAND AND WAIVE THE LANDLORD'S RIGHT TO TERMINATE THE LEASE/TENANT'S RIGHT OF POSSESSION AND FILE SUIT FOR COLLECTION UNDER THIS NOTICE, UNLESS LANDLORD, OR THE UNDERSIGNED, AGREES IN WRITING TO WITHDRAW THE DEMAND IN EXCHANGE FOR RECEIVING PARTIAL PAYMENT.

This letter is intended to satisfy the notice requirement set forth in your Lease and as provided for by Illinois statute. Unless payment of the above stated amount is made on or before the expiration of ten (10) days from the service of this notice, your right of possession of the Leased Premises will be terminated and Landlord may thereafter sue you for past due rent. The undersigned is hereby authorized to receive all amounts due.

Once a lawsuit is filed, you may also be liable for the Landlord's attorney fees and costs, which in our experience totals a minimum of $1,000.00. We suggest that you act expeditiously to remedy the default and thereby avoid additional expenses.

KINDLY GOVERN YOURSELF ACCORDINGLY.

Sincerely,

Jeffrey B. Gurian

JBG:jat

cc:    Morgan Street Partners, LLC

# Morgan Street Partners, LLC

C/o Newcastle Properties, LLC
1030 W. Higgins Road
Suite #360
Park Ridge, IL 60068

Phone (847) 685-9800
Fax (847) 685-1309
Email drew@newcastleproperties.com

Date June 30, 2020
Account ID: BKB Chicago
Project Location: Brooklyn Boulders Chicago
100 South Morgan Street
Chicago, IL 60607

Tenant BKB Chicago
Chicago Climbing Gym Company, LLC
2801 Lakeside Drive
Suite 207
Bannockburn, IL 60015

| Date | Type | Description | Amount | | Payment | | Balance | |
|------|------|-------------|--------|--|---------|--|---------|--|
| 4/1/2020 | Base Rent | | $ | 42,538.11 | $ | - | $ | 42,538.11 |
| 4/1/2020 | Real Estate Tax Reimbursement | | $ | 13,462.49 | $ | - | $ | 13,462.49 |
| 4/1/2020 | Insurance Reimbursement | | $ | 306.00 | $ | - | $ | 306.00 |
| 4/1/2020 | CAM Reimbursement | | $ | 650.00 | $ | - | $ | 650.00 |
| 5/1/2020 | Base Rent | | $ | 42,538.11 | $ | - | $ | 42,538.11 |
| 5/1/2020 | Real Estate Tax Reimbursement | | $ | 13,462.49 | $ | - | $ | 13,462.49 |
| 5/1/2020 | Insurance Reimbursement | | $ | 306.00 | $ | - | $ | 306.00 |
| 5/1/2020 | CAM Reimbursement | | $ | 650.00 | $ | - | $ | 650.00 |
| 6/1/2020 | Base Rent | | $ | 42,538.11 | $ | - | $ | 42,538.11 |
| 6/1/2020 | Real Estate Tax Reimbursement | | $ | 13,462.49 | $ | - | $ | 13,462.49 |
| 6/1/2020 | Insurance Reimbursement | | $ | 306.00 | $ | - | $ | 306.00 |
| 6/1/2020 | CAM Reimbursement | | $ | 650.00 | $ | - | $ | 650.00 |
| | | | **TOTAL** | | | | $ | 170,869.80 |

Patti Killips

From: TrackingUpdates@fedex.com
Sent: Tuesday, May 12, 2020 11:08 AM
To: Patti Killips
Subject: FedEx Shipment 770430141826 Delivered

# Your package has been delivered

## Tracking # 770430141826

Ship date:
Mon, 5/11/2020

**Patti Killips**
Becker Gurian
Highland Park, IL 60035
US

 **Delivered**

Delivery date
Tue, 5/12/2020 11:03
am

Chicago Climbing Gym
Company, LLC
2801 Lakeside Drive
Suite 207
DEERFIELD, IL 60015
US



### Shipment Facts

Our records indicate that the following package has been delivered

| | |
|---|---|
| **Tracking number:** | 770430141826 |
| **Status:** | Delivered 05/12/2020 11:03 AM Signed for By: P RUBIN |
| **Reference:** | 112.145 |
| **Signed for by:** | P RUBIN |
| **Delivery location:** | BANNOCKBURN, IL |
| **Delivered to:** | Receptionist/Front Desk |
| **Service type:** | FedEx Standard Overnight® |

1