UNITED STATES DISTRICT COURT
OF NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MORGAN STREET PARTNERS, LLC, | |
| Plaintiff, | |
| v. | Case No. 20-cv-4468 |
| CHICAGO CLIMBING GYM COMPANY, LLC, et al., | Judge Mary M. Rowland |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

    This case arises from the fall-out between a landlord and tenant due to the COVID-19 pandemic. Plaintiff Morgan Street Partners, LLC leases a commercial property in Chicago to Defendant Chicago Climbing Gym Company, LLC, which operates a climbing gym on that property. Co-Defendant Brooklyn Boulders serves as the lease guarantor. When the pandemic hit Illinois, the State of Illinois and City of Chicago forced Chicago Climbing Gym to shut down its operations for months and then reopen at reduced capacity. Chicago Climbing Gym's business took a hit, so it stopped paying rent during the complete shutdown and started paying only reduced rent once allowed to reopen. Plaintiff claims that Defendants' failures to pay full rent constitute a breach of contract, while Defendants counter that a force majeure clause in the parties' lease agreement justified their actions and excused their payment obligations. Plaintiff has moved for summary judgment [40]. For the reasons explained below, this Court denies Plaintiff's motion.

1

I.  Background

This Court takes the following facts from Plaintiff's statement of facts [42], Defendants' response to Plaintiff's statement of facts [50], and Defendants' statement of additional facts [51]. Because Plaintiff did not respond to Defendants' statement of additional facts [51], this Court deems those facts admitted. *Magee v. McDonald's Corp.*, No. 16-CV-5652, 2019 WL 10447014, at *3 (N.D. Ill. Mar. 28, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1017 (N.D. Ill. 2018).[1]

A.  Lease Agreement

Plaintiff owns the commercial property located at 100 South Morgan Street, Chicago, Illinois 60607. [42] ¶ 4. Plaintiff is the successor in interest to 100 S. Morgan, LLC (Former Landlord). *Id.* ¶ 5. On January 15, 2013, the Former Landlord and Defendant Chicago Climbing Gym, LLC entered into a lease agreement (Lease) governing the property. [51] ¶ 1; [42] ¶ 6. The Former Landlord drafted the Lease Agreement. [51] ¶ 12. Concurrent with the signing of the Lease, Defendant Brooklyn Boulders, LLC executed a guaranty up to $250,000 for base rent, additional rent, and other amounts due under the lease. [51] ¶ 13; [42] ¶ 7.

The Lease provides, in relevant part, that "Tenant shall use the Premises as a recreational 'rock climbing' facility and other ancillary uses, including but not limited

---

[1] While Defendants correctly note that Plaintiff's citations in their brief to raw evidence, rather than their statements of fact, is procedurally improper, *Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 667 (N.D. Ill. 2015), this Court excuses Plaintiff's procedural noncompliance and will consider Plaintiff's properly supported facts. This Court agrees with Defendants, however, that Plaintiff submits an inadmissible declaration from its asset manager, Drew Trammell, [42-3], because the declaration is undated and is not made "under penalty of perjury." *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017). This Court thus strikes the declaration from the summary judgment record.

to retail space, offices, coffee/juice bar and a fitness facility." [51-1] at 5. The Lease contains a force majeure clause, which states as follows:

> It is understood and agreed between the parties hereto that time is of the essence of all the terms and provisions of this Lease. However, whenever a period of time is herein prescribed for the taking of any action by Landlord or Tenant, then Landlord or Tenant, as applicable, shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, terrorism, legal requirements, or any other cause whatsoever beyond the control of Landlord or Tenant, as applicable. The foregoing force majeure provisions of this paragraph are applicable to any payments of Rent or other monies due from Tenant under this Lease.

*Id.* at 14. The Lease also contains a clause titled "Government and Other Requirements" which provides that:

> Tenant shall faithfully observe in the use of the Premises all municipal and county ordinances and codes and all state and federal statutes, rules and regulations now in force or which may hereafter be in effect.

*Id.* at 6.

> In a section title "Allowances," the Lease states:
>
> Landlord shall provide up to $625,000 (the 'Original Allowance') plus $100,000 (the 'Additional Allowance,' and together with the Original Allowance, collectively, the 'Allowance') as a tenant improvement allowance to be applied to the construction costs, fit-out and finish of the Premises based on actual invoices. The payment of the Allowance shall be made within three (3) business days upon Landlord's receipt of actual invoices for labor and services performed and materials furnished.
>
> Tenant will repay the Additional Allowance, plus interest, in eleven (11) installments of $10,000 each, with the first payment on February 1, 2014, and successive installments on the first day of each calendar month thereafter with the last payment on December 1, 2014. The monthly payments are based on the Additional Allowance of $100,000 and Tenant acknowledges that the eleven (11) installments will total a repayment of $110,000. The repayment of the Additional Allowances shall be deemed 'Additional Rent' hereunder.

3

*Id.* at 2.

In addition to those provisions, the Lease sets forth a schedule of monthly base rent payments, starting from July 1, 2013 through June 30, 2028. *Id.* at 2–3.

### B.   First Amendment to the Lease

On January 15, 2013, the Former Landlord and Chicago Climbing Gym executed a First Amendment to Space Lease Agreement (the Amended Lease). [51] ¶ 14; [51-1] at 52.

The Amended Lease contains a section titled "Allowances" that provides:

> Pursuant to Section 3D(i) of the Lease, Landlord has heretofore paid to Tenant, the full Original Allowance of $625,000, with respect to Tenant's improvement allowance at the Premises, and Tenant hereby acknowledges receipt of the foregoing… In addition to the Original Allowance, Section 3D(i) of the Lease also contemplates that the Additional Allowance loan in the principal amount of $100,000 to be repaid by Tenant in accordance with Section 3D(ii) of the Lease will be adjusted. The parties further acknowledge and agree that Carolyn D. Berg, one of the members of Landlord, will be providing the Additional Allowance loan to Tenant, in lieu of Landlord's obligations to provide such loan, under the terms and conditions set forth in the Note attached hereto and incorporated herein as <u>Exhibit A</u> ('Note.'). Upon execution of the Note by Tenant and disbursement of the Loan (as defined in the Note) to Tenant, Landlord's obligations under the Lease to provide the Allowance to Tenant shall be deemed satisfied

[51-1] at 52. In another section titled "Default," the Amended Lease provides:

> If any default shall be made by Tenant under the Note and such default shall continue after any applicable cure period, then such default shall constitute an 'Event of Default' as defined in the Lease. If an Event of Default shall occur under the Lease, in addition to all rights and remedies of Landlord set forth in the Lease, the entire amount of the

4

> Original Allowance together with any abated rental amounts shall be immediately due and payable to Landlord.

*Id.* The Amended Lease did not otherwise modify the above Lease provisions discussed above, including the force majeure provision. *See* [51-1] at 52–54. Chicago Climbing Gym paid the entirety of the $100,000 Carolyn Berg Note by September 30, 2015. [51] ¶ 17.

### C. The Pandemic

From January 1, 2017 until the start of the pandemic in March 2020, Chicago Climbing Gym timely paid rent and complied with its obligations under the Lease. [51] ¶ 19.

Beginning in March 2020, various executive orders by the State of Illinois and the City of Chicago required Chicago Climbing Gym to close its gym. *Id.* ¶ 20. The State and City modified those orders multiple times over the next year and a half. *Id.* ¶¶ 21, 23. For instance, the State issued an executive order on June 26, 2020 allowing 50% reopening for gyms, another executive order on November 18, 2020 reducing gym capacity to 25%, an executive order on May 17, 2021 allowing gyms to open with 60% capacity, and finally, an executive order on June 11, 2021 allowing for complete reopening with no capacity limits. *Id.* ¶ 21. According to Shane O'Brien, the Chief Financial Officer of Fifth Concerto Holdo Inc. (the sole and managing member of both Defendants), these government orders "are the exclusive reason" that

Chicago Climbing Gym could not pay rent owed under the Lease. *Id.* ¶ 27; [51-1] at 57.

After closing in March 2020, Chicago Climbing Gym reopened in August 2020 at reduced capacity. *Id.* ¶ 28. In connection with the reopening, Chicago Climbing Gym made percentage rent payments that corresponded to its percentage of allowed occupancy. *Id.* ¶ 29. It was not until June 11, 2021 that Chicago Climbing Gym could legally operate its rock-climbing gym at full capacity under Illinois law. *Id.* ¶¶ 22, 24. Chicago Climbing Gym remains in possession of the premises. [42] ¶ 24.

According to Plaintiff, Chicago Climbing Gym owes it $655,281.86 in unpaid rent, late fees, taxes, and insurance. *Id.* ¶ 23.

**D.     Plaintiff's Claims**

In its (operative) amended complaint, Plaintiff brings a three-count complaint for: breach of contract against Chicago Climbing Gym (Count I), breach of contract against Brooklyn Boulders (Count II), and breach of contract against Jeremy Balboni (Count III). [19]. Defendants asserted various affirmative defenses, including the application of the "time of essence and force majeure provision" in the Lease (first affirmative defense), commercial impracticability or impossibility (second affirmative defense), commercial frustration (third affirmative defense), and government regulation (fourth affirmative defense). [29]. In August 2021, Plaintiff voluntarily dismissed its claim against individual defendant Jeremy Balboni (Count III). [46]; [47]. Plaintiff has moved now for summary judgment on Counts I and II. [40].

**II.     Legal Standard**

Summary judgment is proper where there is "no dispute as to any material fact

6

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

**III. Analysis**

Plaintiff has moved for summary judgment on Counts I and II, arguing that the undisputed evidence shows that Defendants breached the Lease by: (1) failing to pay rent; and (2) failing to return the Original Allowance. [41]. Defendants have responded that the Lease's force majeure clause is unambiguous and this Court

7

should find no rent was owed during the shutdowns. [52] at 11. Defendants further respond that even if the force majeure clause is inapplicable, multiple common law contract defenses relieve them of their rent performance; and that Plaintiff cannot recover the Original Allowance. [52].

Under Illinois law, which the parties agree governs, a plaintiff suing for breach of contract must prove the following four elements: (1) a contract existed; (2) Plaintiff performed the conditions precedent required by the contract; (3) Defendants breached the contract; and (4) damages. *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020), *reh'g denied* (Sept. 4, 2020). The parties agree that valid contracts exist in the Lease and Amended Lease. There is no evidence that Plaintiff failed to perform the conditions precedent. Defendants also concede that they paid no rent or reduced rent during the pendency of the government orders, and thus, damages would be available to Plaintiff *if* Defendants breached the Lease. The parties' dispute thus centers around the third element—breach—and whether the Lease's force majeure clause and/or other common law defenses excuse Plaintiff's obligation to pay rent under the Lease.

### A.  Defendants Have Raised a Genuine Issue of Material Fact as to Whether It Breached the Contract For Failure to Pay Rent

Plaintiff contends it is entitled to judgment on its breach of contract claims because neither the force majeure clause nor the common law defenses that Defendants raise apply to excuse Defendants' rent payments. *See generally* [41]. In response, Defendants rely primarily upon the force majeure clause in the Lease,

8

arguing that its plain terms excused their obligations to pay rent due to the shutdown orders. *See* [52].

In Illinois, for a force majeure clause to apply by government order or regulation, the order must "clearly direct or prohibit an act which proximately causes non-performance or breach of a contract." *N. Ill. Gas Co. v. Energy Co-op., Inc.*, N.E.2d 1049, 1058 (Ill. App. Ct. 1984). The circumstances surrounding the COVID-19 pandemic implicate the force majeure clause in the Lease. The clause provides that the tenant "shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to . . . legal requirements, or any other cause whatsoever beyond the control of Landlord or Tenant." [51-1] at 14. The clause explicitly applies "to any payments of Rent or other monies due from Tenant under this Lease." *Id.* Giving that language its plain and ordinary meaning, *see Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC - Arlington Place One*, 20 F.4th 359, 372 (7th Cir. 2021), the force majeure clause allows a party to delay performance under the Lease when a delay is "due to" "legal requirements" or another event outside "the control" of either side.

Executive orders requiring gym closure constitute "legal requirements" forcing Defendants to shut down the gym. A global pandemic that requires the unprecedented cessation of normal business activity also arguably falls under the umbrella of "other cause whatsoever beyond the control of Landlord or Tenant." Moreover, Defendants have offered uncontroverted evidence that the pandemic—and the government orders—are the sole reason they could not pay rent to Plaintiff. *See*

9

*N. Ill. Gas. Co.*, 461 N.E.2d at 1058 (noting that a force majeure defense applies if an act proximately caused non-performance). Thus, this Court finds as a matter of law that the force majeure clause applies to the facts of this case and delayed Defendants' rent payments to Plaintiff, at least for the period of time the government orders forced them to shut down or operate at reduced capacity. *See* [51-1] at 14 (excusing "any delays due to" "legal requirements" or "any other cause whatsoever beyond the control of Landlord of Tenant"); *see also, e.g.*, *In re Hitz Rest. Grp.*, 616 B.R. 374, 377 (Bankr. N.D. Ill. 2020) (finding that Governor Pritzker's executive order "unambiguously triggered a contract's force majeure clause providing that a tenant "shall be excused from performing its obligations . . . provided in this Lease . . . so long as the performance of any of its obligations are prevented or delayed, retarded or hindered by . . . orders of government").

      Plaintiff argues that even if the force majeure clause excused Defendants' rent payments during the pendency of the orders mandating a *complete* shutdown of the gym, Defendants have nonetheless breached the Lease by failing to pay the agreed upon amount of monthly rent since reopening. [41] at 4–5. Plaintiff points to evidence showing that Defendants paid only partial rent between August 2020 and May 2021. *See* [42-7] at 1–2. During that time period, however, it is undisputed that Chicago Climbing Gym could not legally operate at full capacity due to government orders restricting capacity in indoor spaces. In fact, it could not and did not legally operate at full capacity until June 11, 2021. [51] ¶¶ 22, 24. Thus, like the complete shutdown order, the government orders relating to reduced capacity also constitute

10

"legal requirements" under the Lease's force majeure clause that allowed Defendants to delay full rent payments. [51-1] at 14.

Plaintiff also contends that "foreseeability is paramount," and that this Court should reject Defendants' force majeure defense because the pandemic was a foreseeable event. [41] at 3. But the plain text of the force majeure clause says nothing about foreseeability. To be sure, foreseeability is a concept embedded in the common law contract defenses of impossibility, impracticability, and frustration of purpose—alternative defenses that Defendants have raised to the force majeure defense. To succeed on those defenses, Defendants would have to prove that COVID-19 was not a foreseeable event. *See N. Ill. Gas Co.*, 461 N.E.2d at 1059 (frustration of purpose); *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 933 N.E.2d 860, 865 (Ill. App. Ct. 2010) (impossibility); *Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.*, 731 F. Supp. 850, 855 (N.D. Ill. 1990) (noting that the concept of "impracticability" falls under the doctrine of "impossibility"). But this Court need not consider applicability of those common law defenses because express force majeure clauses in contracts supersede those defenses. *See Commonwealth Edison*, 731 F. Supp. at 856 (holding that because the parties "spelled out the circumstances" that would fall under a contract's force majeure clause "with considerable specificity," it "is the contract, rather than a body of judicial doctrine, that I must interpret"); *see also In re Hitz*, 616 B.R. at 377 (noting that force majeure clauses "supersede" common law contract defenses of impossibility).

11

In short, because Defendants have demonstrated the viability of their force majeure defense, the record precludes summary judgment to Plaintiff on their breach of contract claims for rent payments due during the time the government orders remained in effect.

In their opposition to Plaintiff's motion for summary judgment, Defendants have requested that judgment be entered in their favor, [52] at 16, presumably upon the assumption that this Court would agree with them that the government orders triggered the applicability of the force majeure clause. This Court finds, however, that Defendants' request for judgment is inappropriate and premature at this time. Defendants did not themselves move for summary judgment on their claims, and they are not entitled to judgment merely because they have defeated Plaintiff's motion. More importantly, under a plain reading of Lease's force majeure clause, a qualifying force majeure event acts only to *delay* performance, not to abate rent forever. *See* [51-1] at 14 (providing that the contracting party "shall not be liable or responsible for, and *there shall be excluded from the computation of such period of time, any delays* due to . . . legal requirements, or any other cause whatsoever beyond the control of Landlord or Tenant") (emphasis added). In contrast to other force majeure clauses commonly found in commercial leases, the force majeure clause here does not clearly prescribe a period of time for a party to render performance after a force majeure event causes a party to delay performance. *See id.*; *cf. STORE SPE LA Fitness v. Fitness Int'l, LLC*, No. SACV20953JVSADSX, 2021 WL 3285036, at *8 (C.D. Cal. June 30, 2021) (analyzing a force majeure clause providing that, if a force majeure

event delays performance, "the period of such delay . . . shall be deemed added to the time provided herein for the performance of any such obligation"); *Williamsburg Climbing Gym Co., LLC v. Ronit Realty LLC*, No. 120CV2073FBRML, 2022 WL 43753, at *4 (E.D.N.Y. Jan. 5, 2022) (interpreting a force majeure clause that excuses performance due to a force majeure event "for the period of delay," and provides that "the period for the performance of the same shall be extended by the period"). Accordingly, there remains an outstanding question as to when Defendants' payments became or will become due. And if the evidence at trial shows that those payments have already been due but that Defendants have still not paid, Defendants might still be found in breach of the Lease.

### B. Defendants Have Raised a Triable Issue on Whether They Must Return the Original Allowance

Plaintiff also assert breach of contract arguing that Defendants are liable for the Original Allowance of $625,000 because they have "defaulted" on rent and that triggered a duty to return the Original Allowance. [41] at 7. Plaintiff's argument rests upon a combination of provisions in the Lease and Amended Lease.

The Lease provides that the Landlord would provide $625,000 as an "Original Allowance" for Chicago Climbing Gym to make improvements to the premises:

> Landlord shall provide up to $625,000 (the 'Original Allowance') plus $100,000 (the 'Additional Allowance,' and together with the Original Allowance, collectively, the 'Allowance') as a tenant improvement allowance to be applied to the construction costs, fit-out and finish of the Premises based on actual invoices.

[51-1] at 2. The Amended Lease contains a provision stating, in relevant part:

> If an Event of Default shall occur under the Lease, in addition to all rights and remedies of Landlord set forth in the Lease, the entire

13

> amount of the Original Allowance together with any abated rental amounts shall be immediately due and payable to Landlord.

*Id.* at 52. The Lease defines such "Event of Default" as including when the tenant "default[s] . . . in the payment of any Rent or other charges herein reserved upon the date the same become [sic] due and payable and such default continues for a period of ten (10) business days after written notice of nonpayment." [51-1] at 10.

Read in combination, the contracts ostensibly entitle Plaintiff to the entire amount of the Original Allowance once: (1) Defendants fail to timely make their rent payments; and (2) Defendants remain in default after Plaintiff provides written notice of nonpayment. Consequently, Plaintiff insists that Defendants have breached the Lease because they have not returned the Original Allowance even though they have defaulted on rent and have received from Plaintiff a written notice of nonpayment in May 2020. *See* [50] ¶ 19. As discussed, however, the force majeure suspended Defendants' obligation to pay rent, at least for some period of time. A triable question exists as to whether the rent has become due, and if so, whether Defendants' failure to pay that rent has resulted in an "Event of Default" as defined by the Lease. For this reason, this Court also denies summary judgment as to Plaintiff's breach of contract claim based upon the Original Allowance.

IV. **Conclusion**

For the reasons explained above, this Court denies Plaintiff's motion for summary judgment [40]. This Court sets a status hearing for April 11, 2022 at 9:00 AM. Parties are to confer prior to the status and be prepared to inform the Court

14

whether they believe a settlement conference would be fruitful and/or to set a bench trial. Parties shall dial 866-434-5269; access code 3751971.

E N T E R:

Dated: March 1, 2022

/s/ Mary M. Rowland

MARY M. ROWLAND
United States District Judge